**Isaac N. Rice, Appellant, v. Thomas E. Dougherty et al., Appellees.**

**Gen. No. 14,992.**

1. TRUSTS—*classification.* Trusts are of two kinds: express and implied; implied trusts are again divided into resulting and constructive trusts.

2. TRUSTS—*what essential to establish resulting trust.* In order to establish a resulting trust the one claiming it must show that he has furnished the consideration money or some aliquot part thereof, as part of the original transaction at the time the property, in which the trust is claimed, was acquired.

3. ACCOUNTING—*chancery follows profits.* No matter what form profits may be converted into, equity will follow them.

4. DECREES—*what aids construction of.* A decree must be read and construed in connection with the pleadings.

5. DECREES—*when final.* A decree is final which clearly and conclusively fixes the relative rights of the contending parties in respect to the questions in contest.

Bill in equity. Appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed and remanded. Opinion filed May 11, 1909. Rehearing denied May 25, 1909.

**Statement by the Court.** This is an appeal from a a decree, rendered October 14, 1907, in the Circuit Court of Cook county, dismissing for want of equity the complainant's, appellant's, bill of complaint.

Appellant, Isaac N. Rice, filed his bill, on January 22, 1900, against Thomas E. Dougherty and the Schaeffer Piano Manufacturing Company. The controversy involved is between Rice and Dougherty.

The bill in substance alleges: That complainant is a man of long experience in the manufacture and sale of pianos; that on January 1, 1908, and for some ten years prior thereto, he was president, superintendent and practical head of the Schaeffer Piano Company, an Illinois corporation, of which his wife was the principal stockholder; that the company had the right to manufacture and sell the "Schaeffer" piano which had been sold on the market for twenty-five years and had a valuable reputation with the trade; that in his aforesaid position he had assembled over one hundred workmen skilled in the manufacture and building of pianos; that, in December, 1897, the Chicago Cottage Organ Company, a creditor, obtained a judgment for about $16,000 against the Piano Company, and levied an·execution upon the plant of the company, including real estate, machinery, raw material, pianos in all stages of manufacture and equipments; that these assets were bought in, at a sheriff's sale, by the Organ Company; that the real estate, machinery and equipments were of the value of $50,000 and the other assets were of the value of $30,000; that immediately thereafter the Piano Company made an assignment for the benefit of its creditors; that knowing the value of the assets and business and knowing the scales, patterns, the name of the "Schaeffer" piano and good will of the Piano Company's business were not levied upon and that the business could not be carried on successfully without these, complainant arranged with the Organ Company to purchase the assets bought by that company and with the assignee to purchase the assets he

had; that when the Piano Company closed, the workmen were without employment and complainant arranged with them that they hold themselves in readiness to be assembled to resume work at the same plant; that having made these arrangements complainant advertised for some one with capital and the defendant Thomas E. Dougherty responded; that when he so responded complainant gave Dougherty full information concerning the plant, assets and business and of the profits to be made in continuing the same; that complainant and Dougherty then entered into negotiations regarding a partnership for the purchase of these assets and the continuation of this business; that the negotiations resulted in an agreement of partnership upon the terms that Dougherty was to furnish the necessary money for the purchase of these assets according to the terms previously arranged by complainant with the Organ Company and the assignee; that these assets were purchased and for that purpose Dougherty furnished about $23,000; that by mutual agreement these assets were to be transferred to Dougherty for the use and benefit of himself and complainant and he was to have a lien thereupon and hold the same to secure himself for the money he had advanced; that it was arranged complainant and Dougherty should, each, first draw from the business $200 per month for living expenses and then, after Dougherty had been repaid, all accruing profits were to be equally divided between them, they being equal partners in the excess above the purchase price; that they started in business on January 1, 1898, and continued for one year and further arranged for a continuation during the year 1899 and started upon the business of that year; that complainant having implicit confidence in the integrity and financial and business ability of Dougherty, and Dougherty having no knowlege or experience in manufacturing pianos, it was arranged that Dougherty should have charge of the financial affairs and have control of the books and management of the factory,

in so far as the supervision and operation of the plant and business was concerned, and that complainant should have charge of the sales and policy to be adopted in conducting the business and the sales and he supervised and determined the character of pianos to be made and controlled the sales; that these duties on the part of complainant required him to spend the greater portion of his time away from Chicago and outside of the state of Illinois; that during the year 1898, after the forming of the partnership, it was agreed to organize a corporation to be called the Schaeffer Piano Manufacturing Company and that the assets should be transferred to that corporation in payment for its stock, and, further, that Dougherty should take charge of the matter of forming such corporation; that a proposition of issuing preferred stock to Dougherty, in payment of his investment, was at first considered but, later, it was agreed that the corporate stock should be equally divided and bonds, to the amount of $35,000, secured by the property of the corporation, should be issued to Dougherty in payment of the money then owing to him; that the difference between $35,000 and what was due him he agreed he would advance to be used as working capital; that, subsequently, during complainant's absence, Dougherty organized such corporation and himself subscribed for all the stock except two shares, one of which was issued to his wife and the other to his attorney; that the assets purchased from the Organ Company Dougherty caused to be conveyed directly to the new corporation; that the business aforesaid began to be profitable at the start and has continued to be a profitable and paying business ever since and complainant's just share of the profits is $40,000; that the new corporation has conducted the business ever since its organization; that complainant has frequently requested of Dougherty that the corporate stock be equally divided, as arranged, and that bonds be issued, as was also arranged, but Dougherty has from time to time put him off and has failed and neglected to comply with the

requests; that, in 1899, while complainant was away from the state, Dougherty assumed exclusive control and has ever since refused and declined to allow complainant to have any connection with the business, or, thereafter, to draw the $200 per month or any portion thereof and Dougherty now holds and claims sole and exclusive ownership.

The prayer of the bill is for a general accounting; that the respective rights of complainant and defendant may be ascertained; that a receiver be appointed; that the partnership be decreed dissolved, and for general relief.

The corporation answered admitting the purchase of the assets of the old corporation, but denied that complainant had any interest therein, and set up that complainant was merely a salesman who had been discharged by the corporation.

Dougherty filed his answer on February 5, 1900, and denied substantially all of the allegations of the bill of complaint except the purchase of the assets of the old corporation. This answer sets up the organization of the new corporation on February 10, 1898, with a capital stock of $75,000, and asserts that complainant has no interest therein.

On November 21, 1900, an order was entered in the cause referring it to a master "to take and report the evidence together with his opinion thereon as to whether the complainant is entitled to an interlocutory decree directing an accounting herein."

After the lapse of a period of substantially five years from the date of reference, the master, on October 26, 1905, made a report to the court of the proceedings during the reference. The testimony of the witnesses heard during the reference appears upon less than 123 typewritten pages. Neither party appears to have exhibited any diligence in the prosecution of the cause; nor did the master make any effort to expedite or terminate the same.

The master states his conclusions as follows:

"Taking, therefore, into consideration all the facts and circumstances surrounding the parties at the time, their subsequent course of conduct, as well as the testimony of the parties, I am of the opinion that the only arrangement at the time the property was purchased by Dougherty was the arrangement, as testified to by Dougherty, that is, that Rice should be employed with a salary of $200 per month as sales agent and should receive, in addition, one-half the net profits for the first year if there were any.

"I find further that the complainant has failed to sustain the allegations of his bill of complaint, and that the bill should be dismissed for want of equity."

Objections to this report were filed by complainant, and, having been overruled by the master and filed in court they were, on January 3, 1906, ordered to stand as exceptions to the report.

At the June term, 1906, viz: July 13, 1906, the exceptions having been heard, a decree was rendered by the then sitting chancellor, as follows: "It is considered and ordered by the court that the said exceptions of complainant, to the said report of the master in chancery herein, be, and the same are, hereby sustained.

"The court finds that the complainant is entitled to an interlocutory decree, directing an accounting herein; and It is ordered this cause be, and the same is, referred to Roswell B. Mason, one of the masters in chancery of this court, to take and state an account herein, allowing the defendant, Thomas E. Dougherty, interest on the money invested by him, at the legal rate, and a salary of two hundred dollars ($200) per month, and allowing the complainant a salary of two hundred dollars per month and half of the net profits."

At the September term, 1906, on the nineteenth day of that month, the following order was made: "On motion of defendants it is ordered that the motion of defendants to vacate the order of July 13, 1906, be and hereby is entered and continued." We find no motion, such as that referred to, in the record.

On October 3, 1907, the following order was made

and entered: ''On motion of solicitor for defendants the interlocutory order entered herein on the 13th day of July, 1907, [?] directing an accounting herein is set aside and a rehearing herein is allowed upon the exceptions filed by complainant to the master's report.''

On October 14, 1907, the chancellor reheard the exceptions to the master's report and rendered a decree as follows:

''This cause having been brought on this day to be heard upon a bill of complaint, the several answers of the defendants thereto, the replications to said answers, the proofs and exhibits herein and the report of Edward A. Dicker, a master in chancery of this court, made in pursuance of an order of reference and the exceptions of complainant to said report; and said exceptions having been argued by counsel for the respective parties hereto, it is ordered and adjudged by the court that said exceptions be overruled, and the said report be and is hereby confirmed.

''Now, therefore on consideration thereof, it is ordered, adjudged and decreed that the complainant's said bill of complaint be and the same is hereby dismissed for want of equity, with costs to the defendant to be taxed by the Clerk.''

This appeal is prosecuted to reverse that decree. Among the errors assigned are: one that the chancellor erred in allowing a rehearing upon the exceptions to the master's report, and one that the chancellor erred in dismissing complainant's bill of complaint for want of equity.

FRANCIS M. LOWES, for appellant; WALTER OLDS and THOMAS MARSHALL, of counsel.

W. S. OPPENHEIM, for appellees.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

Trusts are of two kinds: express and implied. Im-

plied trusts are again divided into resulting and constructive trusts. A resulting trust—being one of the class of implied trusts—arises only by implication of law and not by contract. "Such a trust is never raised unless the money of the *cestui que trust* was used in the purchase of the property in which the trust is claimed to exist;" Jacksonville Nat. Bank v. Beesley, 159 Ill. 120, 125. In order to establish a resulting trust the one claiming it must show that he has furnished the consideration money or some aliquot part thereof, as part of the original transaction at the time the property, in which the trust is claimed, was acquired. We agree fully with appellees' contention that there is in this case no room for establishing a resulting trust. But the bill is not framed upon the theory of establishing a resulting trust. The theory thereof seems to be a mixed one of constructive trust and partnership. It is a very inartificial bill of complaint and was apparently drawn without opportunity of full preparation and without a clear and well-defined idea, in the mind of the pleader, of maintaining the bill upon any definite theory of law. The ground covered and the scope of the statements rather incline to the theory of a constructive trust. These trusts, like the resulting trusts, arise, wholly, by implication of law and irrespective of contract. Equity establishes them in order to prevent one person from taking any unfair or unjust pecuniary advantage of another where that is made possible either by reason of some position or relation in which that other has been placed by such person or by some other fiduciary relation. See, for instance, Davis v. Hamlin, 108 Ill. 39. In the bill before us the theory of a constructive trust appears to be that Rice, at the time Dougherty appeared, was in a situation of some financial value and advantage, in connection with the assets and business of the old piano company and the opportunity of forming a new and promising business. The new business was formed, as a result of the combined efforts of Dougherty and

Rice, although the contribution by each was of a different character and the business, as alleged, did in fact become a very profitable and prosperous business. Thereupon, it is alleged, Dougherty, who was, by reason of the trust and confidence imposed in him, enabled so to do, availed himself of the opportunity for his sole financial benefit and advantage and excluded Rice from the business and profits. It appears to be claimed that a constructive trust has arisen in favor of Rice in the profits that have grown out of the use of Dougherty's money and Rice's plans, initial knowledge, co-operation, time and other efforts. In this connection the manner in which Dougherty was brought into the business and what he has led Rice to believe and from time to time said to him, is also invoked. If it be true that Dougherty obtained a profitable investment of his money through Rice's knowledge and efforts, together with his own, and, in the same connection, Rice was led to believe that, after Dougherty had been refunded his investment, they would share equally in the surplus or profits, Dougherty would be estopped from claiming the contrary after the business had proved profitable and then, no matter what form those profits might be converted into, equity would follow them.

But, as we are obliged to reverse and remand this cause, without consideration of the merits, we have refrained from an examination into these merits and we have no opinion thereupon.

We are of opinion that the decree rendered July 13, 1906, is a final decree. While that decree was drafted regardless of the rules and practice governing the formation of decrees yet, in and by the language thereof and the necessary intendments and inferences that follow thereupon, that decree, so far as the chancellor, that is the Circuit Court, is concerned, finally operates upon and disposes of the rights of the parties which are in contention. The decree determines how the property subject-matter in controversy shall be disposed of. In that respect it does not contemplate,

but clearly negatives the idea, that the chancellor shall again inquire or investigate any further. Obviously it is designed to be final and conclusive in that regard. That a decree must be read and construed in connection with the pleadings is an elementary rule, and that rule aids us here in understanding a decree which would, without it, perhaps, be unintelligible. The decree definitely and expressly allows each of the parties —Dougherty and complainant—two hundred dollars per month, which the bill discloses to be for living expenses. The payments of these amounts must, by necessary and reasonable intendment, be considered to begin when the business involved began. Being payable monthly these payments, by necessary inference, take precedence, in order of payment, ahead of other allowances provided for in the decree. In the light of the rule referred to we find the decree determines that Dougherty has the right to be refunded the money invested by him, there is no contention to the contrary in the pleadings, and the decree expressly provides that he shall have lawful interest thereupon, which is, in this state, five per centum per annum. The pleadings show no contention but what this investment, with interest thereupon, shall have priority, subordinate only to the monthly payments of two hundred dollars, and, besides, the use of the word "profits" in the decree, in providing for the disposition of the remainder determines for the master, who is to take the accounting decreed, the order of priority between this item and the remainder. Profit is naturally subordinate to investment. Finally the decree disposes of one-half of the net profits by allowing the same to the complainant and thus limits what he is entitled to, necessarily the other half is allowed to Dougherty, the only other person in contention according to the pleadings. Thus it appears that the basis upon which an accounting, if necessary in regard to the business conducted before the incorporation, might be had and the principles that should govern the master in taking such account-

ing, are clearly ascertainable from the decree. The decree further orders the cause to be referred to a master to take and state an account. The relative rights of the two contending parties, in respect to the questions in contest, are clearly and conclusively fixed by the decree. Without reversal of that decree the relative rights of the parties, so far as judicial adjudication is concerned, cannot be otherwise than as thus fixed by the decree.

When a decree determines and definitely settles the rights of the contending parties, relatively, with reference to the subject-matter of the controversy, then the decree is final. That is, when the relative quantity of interest of each of the parties is judicially fixed so that nothing remains but to carry out that adjudication in detail, as, for instance, by a reference to a master to take proof and report upon an accounting, between the parties, according to some basis fixed by the decree, or to ascertain the money equivalent of each of the interests, or to make a sale for division of the proceeds, then the decree is final and appealable. Such is the principle of De Grasse v. Gossard Co., 236 Ill. 73, 76. This is the more practical and, in reason, the better rule; for, perchance, the chancellor has erred in his determination in respect to the substantial relative rights of the parties. In such case to compel the parties to carry through lengthy and expensive accountings and make proof before the master upon an erroneous theory, before rectification of the error upon review, would put the parties to great and needless expense and, quite possibly, to irreparable injury, through waste of time and onerous expense. The rule, that a decree is final when it determines and definitely settles the rights of contesting parties, irrespective of the fact that something remains to be done, which the chancellor directs to be done before a ministerial officer of the court, such as a master or commissioner, is unquestionably correct on principle. The contrary rule would, in some instances, involve a second exhausting proceeding before

a master upon the correct theory and, sometimes, an accounting and public exposure of books, before a master, in the first instance, where, rightfully, there should be none. It appears clear to us that the decree of July 13, 1906, is a final decree. Whether that decree is supported by the evidence is a different and distinct question, which is not involved in the present appeal. We hold that there was error in setting aside the decree of the June term of court at the September term of court and in then allowing a rehearing upon the exceptions to the master's report. Consequently the decree of October 14, 1907, was erroneously rendered. The fact that the decree rendered at the June term was called an "interlocutory" decree is immaterial. The question whether a decree is final is not determined by what it is called, but by the contents thereof. The substance and effect thereof controls; not the intention of the chancellor, except as ascertained from the contents.

*Reversed and remanded.*