R. O. WATKINS, APPELLEE, v. FRED R. WAITS ET AL., APPELLANTS, VICTOR H. HALLIGAN, APPELLEE.

28 N. W. 2d 206

Filed June 20, 1947. No. 32220.

C. L. *Baskins*, for appellants.

*Van Pelt, Marti & O'Gara* and *V. H. Halligan,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action in equity, brought in the district court for the purpose of having the court determine that a constructive trust exists in favor of the plaintiff, and to compel the defendants, Fred R. Waits and Mae Waits, to specifically perform the obligation of the trust by conveying the land described in the plaintiff's petition to the plaintiff, free and clear of encumbrance. The rights of the defendant Halligan have been established, and he is not involved in this appeal.

The plaintiff's petition alleges an oral agreement

made between the plaintiff and the defendant, Fred R. Waits, wherein the defendant Fred R. Waits was to purchase certain land, referred to as the Shambaugh land, described in the petition. The plaintiff was to receive the farm land and pay $3,000 for it, while the defendants were to receive the pasture land, paying therefor $3,000. The defendants took title to all the land and failed to convey to the plaintiff as provided for in the oral agreement made by the defendant. The petition also pleads an assignment made by the defendant, selling all his right, title, and interest in the Shambaugh farm land to the plaintiff.

The defendants, in their amended answer, claim the defendant, Fred R. Waits, made an oral agreement with the plaintiff that if the plaintiff would purchase certain land known as the Osterhout land, that he, Waits, would turn over the Shambaugh land to the plaintiff; that the assignment of the Shambaugh land to the plaintiff was with the understanding that it was conditioned upon the plaintiff procuring the Osterhout land; and denied any agreement whereby said defendant was to sell to the plaintiff any of the Shambaugh land.

The cross-petition requested the court to cancel the assignment of record, and to compel the plaintiff to account for the rents of the farm land for the year of 1945.

The reply denies there was a contract between the parties with reference to the Osterhout land; admits the defendant requested the plaintiff to purchase the Osterhout land, but that this transaction had nothing to do with the purchase or assignment of the contract involving the Shambaugh farm land; alleges further that the plaintiff went into possession of the farm land, rented it, received the rent, and in so doing relied on his ownership.

The land involved in this suit is the southwest quarter of Section 14, and the northwest quarter and the west half of the southwest quarter of Section 23, Township

7 north, Range 28 West, Sixth Principal Meridian, Frontier County, Nebraska, and at the time of this controversy was owned by Grace Metcalf, Bessie Cook, and Albert J. Shambaugh, known as the Shambaugh heirs, and the land is referred to as the Shambaugh land. There are approximately 125 acres of farm land on the southwest quarter of Section 14, the balance of the quarter being waste and pasture land. There are three small cultivated tracts on the northwest quarter and the west half of the southwest quarter of Section 23, one of 22 acres in the southwest corner; 14 acres near the northeast corner close to the improvements, and a seven or eight acre tract in the north part; all of which are operated with the farm land in the southwest quarter of Section 14. The balance of the Shambaugh land consists of pasture. The improvements consist of a house, barn, hog shed, drive-in granary, and other appurtenances, and are located on the northeast corner of the northwest quarter of Section 23, right at the turn in the highway between Stockville and Curtis. The southwest quarter of Section 14 is directly across the road from a quarter section known as the Woods place, and owned by the plaintiff.

The defendants Waits own land half a mile from the Shambaugh place, which is partly adjoined by the plaintiff's land. The house on the Waits' land is on the east part thereof, making their house approximately a mile distant from the Shambaugh land.

In 1941, the Waits had rented the Shambaugh land, and their son-in-law lived on said land and farmed it and other land with the Waits. He farmed the Shambaugh land in 1944.

Due to the nominal situation of the appellant, Mae Waits, wife of Fred R. Waits, we deem it unnecessary to mention her further, and for clarity and brevity will refer to the appellant Fred R. Waits as the defendant, and to the appellee Watkins as the plaintiff.

The record discloses that during the latter part of

September 1944, the plaintiff had learned through a tenant of his that the defendant was contemplating the purchase of the Shambaugh land. He and the tenant drove to the defendant's farm where the plaintiff and defendant, in the presence of the tenant, engaged in a conversation with reference to the purchase of said land. It developed that the defendant was only interested in the pasture land and the plaintiff in the farm land, for investment purposes. An understanding was reached whereby the defendant, who was acquainted with the Shambaugh heirs, was to contact them and ascertain whether or not the land was for sale, and if so, the amount for which it could be purchased. In November 1944, the plaintiff and his tenant again drove to the defendant's farm where the plaintiff and defendant engaged in a conversation with reference to the purchase of the Shambaugh land. The defendant informed the plaintiff that such land could be purchased for $6,000 for the 400 acres. The plaintiff told the defendant he was willing to pay $3,000 for the southwest quarter of Section 14, which constituted the plowland. The defendant was in agreement that he would take the pasture land for the balance, and indicated that it would be necessary to have some legal papers drawn, and recommended an attorney, who was agreeable to the plaintiff, to do the legal work. At this time the defendant raised one objection to the transaction, to the effect that the pasture land he was receiving was not properly located to the place where he lived, and to keep stock on it would necessitate trips back and forth between his home place and the pasture land during the winter, to feed the stock. The defendant then spoke about a quarter section of land belonging to Bill Osterhout which adjoined his corrals to the east of his improvements. This part of the conversation will be set forth in connection with the defendant's testimony regarding the Osterhout land.

The plaintiff further testified that he had a conver-

sation with the defendant who came to his office on December 21, 1944, wherein the defendant informed him that the contract was all signed up, and he wanted the plaintiff to give him $200 more, and the plaintiff informed him that he would like to have a contract showing the part of the land that he, the plaintiff, was to get. The defendant told him he would give him such a contract. A little later the same day the defendant returned to the plaintiff's office and informed him that he had made an assignment to the plaintiff of the southwest quarter of Section 14, and he had turned it over to the attorney and the same was on its way to be recorded; that he was glad the transaction was completed because he did not want to lose out on the land for his cattle. The same evening the plaintiff drove down to the defendant's farm where they engaged in another conversation wherein the defendant related that he had an agreement with a Mrs. Gardner to subrent the 400 acres. He was desirous of taking some of the buildings off of the Shambaugh land and moving them down to his place. The plaintiff's former tenant was moving off of the Woods place, and the plaintiff told the defendant that he would have no objection to Mrs. Gardner having the Woods place. The plaintiff testified that he rented the Woods place and his part of the Shambaugh land to Mrs. Gardner.

The attorney found the title to the Shambaugh land defective. This required an action in the district court to clear the title, which was completed November 19, 1945.

In April 1945, the plaintiff testified, he agreed with the defendant whereby the defendant was to use the pasture land on the southwest quarter of Section 14, and the plaintiff's tenants were to use the farm land adjoining on the southwest quarter of Section 23.

Certain other conversations were had in 1945 between the plaintiff and the defendant, wherein the defendant desired to be released from the deal, or change

it in some manner whereby the defendant could take over the entire Shambaugh land, and in the fore part of January, conversations of similar import were had between the parties, the plaintiff adhering to the terms of his oral agreement.

In some of the conversations testified to by witnesses appearing in behalf of the plaintiff, the defendant informed them that he and the plaintiff had purchased the Shambaugh land for $6,000, and the manner in which they were to divide the land. In one conversation the defendant told Mrs. Gardner, in substance, that he wished he had had his head working and he would get the corn her son was raising for the plaintiff, which would make a payment on the place. This conversation was corroborated by Mrs. Gardner's son.

To set out the testimony of the several witnesses testifying for the plaintiff in such respect would unduly lengthen this opinion. Suffice it is to say such testimony corroborates the plaintiff's testimony with respect to the oral agreement claimed by him.

An officer of a bank testified that in December 1944, certain papers came to the bank which related to the Shambaugh land: A letter written by A. J. Shambaugh dated December 15, 1944, and an agreement for the sale of the Shambaugh land between the heirs and the defendant, dated December 2, 1944; a check from the plaintiff dated December 17, 1945, in the amount of $3,200; and a warranty deed with the Shambaugh heirs as grantors, the defendant and his wife as grantees, signed in December 1944, consideration $6,000.

The attorney testified that he prepared the agreement for the sale of the real estate between the Shambaugh heirs and the defendant. On December 21, 1944, the attorney typed the assignment appearing on the back of the agreement for the sale of the Shambaugh land, which was signed by the defendant, assigning to the plaintiff all of the defendant's right, title, and interest in and to the southwest quarter of Section 14, as

heretofore described. This contract and assignment was delivered to the proper authority to be recorded. The attorney also had possession of the plaintiff's check for $3,000, dated December 18, 1944, and an additional check made payable to the attorney by the plaintiff, for $200, not dated, received after the assignment was prepared.

In December 1945, the attorney advised the plaintiff to deliver a check for $3,200 to the Curtis State Bank. This check is previously mentioned.

The defendant testified that before he received the letter dated November 2, 1944, from one of the Shambaugh heirs as to whether or not their land could be purchased, he had a conversation with the plaintiff whereby it was arranged that the plaintiff was to try and buy the Osterhout land, and if he accomplished the purchase thereof, the plaintiff would then take the Shambaugh land for the price at which the defendant could purchase it. The plaintiff reported to the defendant the same evening that matters looked favorable for the purchase of the Osterhout land. Thereafter the defendant, in another conversation with the plaintiff, told him he would rather have the Osterhout land than the Shambaugh land. The defendant further testified that between the time he had the contract drawn and the time it came back, the plaintiff told him that the Osterhouts were not interested in selling; that he had not given up; and after the title to the Shambaugh land had been quieted, the plaintiff told him the Osterhout deal was off, and he was going to take the part of the Shambaugh land for which he had orally contracted. The defendant then endeavored to settle the matter with the plaintiff according to his conception of the oral agreement.

The Osterhout land was mentioned in the conversation had in November 1944, between the plaintiff and defendant, the substance of which is heretofore related. According to the plaintiff's testimony there was doubt

in the defendant's mind if the Osterhout land could be purchased, as he had had some difficulty with the Osterhout family. The plaintiff did contact members of the Osterhout family, without success, and notified the defendant that such land could not be purchased..

The trial court found generally in favor of the plaintiff and against defendants on their cross-petition; ordered the plaintiff to deposit $3,200 with the clerk of the district court; directed the defendants Waits to execute a deed to the land claimed by plaintiff by virtue of an oral agreement, and upon failure of the said defendants to do so within a given time, title to the land be quieted in the plaintiff. Defendants appeal.

The first question presented on this appeal is whether or not the evidence is sufficient to warrant the trial court in holding a constructive trust was created. In considering the foregoing question it is necessary to determine whether or not the defendant acted in the capacity of an agent of the plaintiff in purchasing that part of the Shambaugh land claimed by the plaintiff by virtue of an oral agreement.

"An agent is a person having an express or implied authority to represent or act on behalf of another person, who is called his principal." Bowstead on Agency (4th ed.) p. 1.

"An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it. He is a substitute, a deputy, appointed by the principal, with power to do the things which the principal may or can do." 2 C. J. S., Agency, § 1, p. 1025. See, also, 1 Mechem on Agency (2d ed.), § 36, p. 21; 21 R. C. L., Principal and Agent, § 5, p. 819.

The foregoing definitions were approved in Stephenson v. Golden, 279 Mich. 710, 734, 276 N. W. 849, 857, and in Lamb v. Sandall, 135 Neb. 300, 281 N. W. 37.

As stated in Lamb v. Sandall, *supra,* following Harrop

v. Cole, 85 N. J. Eq. 32, 95 A. 378, affirmed in 86 N. J. Eq. 250, 98 A. 1085: "'When one man assumes to act as agent for another, as the representative of another, he necessarily establishes a fiduciary relation between himself and the other person who stands as his principal. This is in the very nature of the transaction because the agent undertakes to act not for his own benefit but for the benefit of his principal, and his principal stays out of his own business and confides in the agent to attend to this business for him. It is the assumption by the agent of his representative status and the confidence necessarily reposed in him by the principal which create the agent's peculiar liabilities and cast special limitations and obligations upon him. The agency may be established by a written contract or a verbal contract, or no contract whatever, * * * .' "

"The test is whether or not the relation is in fact shown to exist. The origin of the confidence is immaterial and the relation may be legal, moral, social, domestic or personal." Quinn v. Phipps, 93 Fla. 805, 113 So. 419.

A fiduciary relation may be established in a large number of ways. It is a mere incident that in this particular case, and in a large number of others, the fiduciary relations grow out of a verbal promise. As the authorities abundantly show, equity will not tolerate the betrayal of confidence, and it makes no difference how this confidence has been obtained.

We conclude from the record, the evidence is sufficient to establish the relationship of principal and agent, between the plaintiff and defendant, in view of the foregoing cited authorities.

In Lamb v. Sandall, *supra*, a case similar in facts to the case at bar, this court followed Harrop v. Cole, *supra*. With reference to the cited case we said: "In this jurisdiction we stand with the states which are in harmony with the New Jersey courts, and we have announced the following as controlling in this state, viz.: 'Where

one employed to act as the agent for another in the purchase of real estate becomes the purchaser himself, he will be considered in equity as holding the property in trust for his principal, although he purchased with his own money, subject to reimbursement for his proper expenditures in that behalf.' Johnson v. Hayward, 74 Neb. 157, 103 N. W. 1058.

"See, also, Dickson v. Stewart, 71 Neb. 424, 98 N. W. 1085; Rice v. Dougherty, 148 Ill. App. 368; Pope v. Dapray, 176 Ill. 478, 52 N. E. 58; Carr v. Craig, 138 Ia. 526, 116 N. W. 720; Matney v. Yates, 121 Va. 506, 93 S. E. 694; Schmidt v. Beiseker, 14 N. Dak. 587, 105 N. W. 1102; Brookings Land & Trust Co. v. Bertness, 17 S. Dak. 293, 96 N. W. 97; Morris v. Reigel, 19 S. Dak. 26, 101 N. W. 1086; Rose v. Hayden, 35 Kan. 106, 10 Pac. 554; Sanford v. Hamner, 115 Ala. 406, 22 So. 117; Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 54 A. L. R. 1173; Stephenson v. Golden, 279 Mich. 710, 276 N. W. 849." See, also, Faust v. Murray, 245 Wis. 643, 15 N. W. 2d 793; Krzysko v. Gaudynski, 207 Wis. 608, 242 N. W. 186; Boswell v. Cunningham, 32 Fla. 277, 13 So. 354, 21 L. R. A. 54; 54 Am. Jur., Trusts, § 237, p. 180.

A constructive trust has been defined as follows: "A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." Restatement of the Law, Trusts, ch. 1, § 1, p. 5. See, also, Federal Trust Co. v. Ireland, 124 Neb. 369, 246 N. W. 707; Wilcox v. Wilcox, 138 Neb. 510, 293 N. W. 378; Fisher v. Keeler, 142 Neb. 728, 7 N. W. 2d 659; Kozina v. Watkins Lbr. Co., 146 Neb. 594, 20 N. W. 2d 606; 1 Scott on Trusts, § 44.1, p. 251.

In Pollard v. McKenney, 69 Neb. 742, 96 N. W. 679, on rehearing 69 Neb. 753, 101 N. W. 9, this court said:

" * * * if a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits; out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title." See, also, Restatement of the Law, Trusts, ch. 12, p. 1249.

In the light of the foregoing authorities and the facts in the case at bar, we hold that a constructive trust was created and established in favor of the plaintiff.

This brings us to the question to be determined, whether or not the statute of frauds bars the plaintiff from recovery from the defendant on an oral agreement relating to the sale of real estate.

Sections 36-103, and 36-104, R. S. 1943, commonly known as the statute of frauds, provide: "No estate or interest in land, other than leases for a term of one year from the making thereof, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same."

"Section 36-103 shall not be construed to affect in any manner the power of a testator in the disposition of his real estate by a last will and testament, nor to prevent any trust from arising or being extinguished by implication or operation of law."

These sections, in substantially the present form, were before this court in Pollard v. McKenney, *supra*. This court there said: "But, by the express provisions of the fourth section, trusts arising by implication, or by operation of law, are excepted from the operation of the statute. Both resulting and constructive trusts ob-

viously fall within the exception." See, also, O'Shea v. O'Shea, 143 Neb. 843, 11 N. W. 2d 540; Windle v. Kelly, 135 Neb. 143, 280 N. W. 445; Reetz v. Olson, 146 Neb. 621, 20 N. W. 2d 687; Raasch v. Lund Land Co., 103 Neb. 157, 170 N. W. 836; Doll v. Doll, 96 Neb. 185, 147 N. W. 471.

Under the foregoing authorities, the defense of the statute of frauds cannot prevail in the instant case.

"Upon appeal of an action in equity, when the testimony of witnesses orally examined before the court on the vital issues is conflicting, this court will, while trying the case *de novo*, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Rogers v. Casady, 134 Neb. 227, 278 N. W. 267; Lamb v. Sandall, *supra*.

In view of the controlling principles and authorities herein discussed, the defendants, Fred R. Waits and his wife, under the facts disclosed by the evidence, are to be properly considered in equity as holding the southwest quarter of Section 14, Township 7 north, Range 28 West, Sixth Principal Meridian, Frontier County, Nebraska, in trust for the plaintiff as determined by the decree of the trial court. It follows that the judgment of the trial court is correct, and it is affirmed.

AFFIRMED.