DOROTHY M. MARCO, EXECUTRIX OF THE LAST WILL AND
TESTAMENT OF LAWRENCE S. MARCO, DECEASED, AND
DOROTHY M. MARCO, INDIVIDUALLY, APPELLEES, V.
JERRY A. MARCO ET AL., APPELLANTS.
JIM MARCO, APPELLANT, V. DOROTHY M. MARCO, APPELLEE.
JERRY A. MARCO, APPELLANT, V. DOROTHY M. MARCO,
APPELLEE.

242 N. W. 2d 867

Filed June 9, 1976. Nos. 40385, 40386, 40387.

Paul E. Watts, J. Joseph McQuillan, Gerald E. Moran, and Robert C. Sigler, for appellants.

Peter E. Marchetti of Nelson, Harding, Marchetti, Leonard & Tate and Jeffrey W. Meyers of Frost, Meyers & Hosford, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

Three separate actions are before us on this appeal. These actions were consolidated for trial in the District Court and for argument here. The petition in No. 40385 was filed on February 28, 1974, and the plaintiff in that action, Dorothy M. Marco, individually and as executrix of the estate of Lawrence S. Marco, deceased, asked to have the defendants, Jerry A. Marco and Jim S. Marco, restrained and enjoined from coming upon a business premises referred to as A-1 Auto Parts, from interfering with her management of the business, from imposing any restraint upon the liberty of the plaintiff, and from coming upon a certain premises which is her home. In that action the defendants counterclaimed, asking to have a constructive trust declared in certain real property of which Dorothy Marco is holder of the legal title as surviving joint tenant of Lawrence S. Marco, her husband and father of the defendants Jerry A. Marco and Jim S. Marco, who are the plaintiff's step-sons. Four tracts of land are involved in the above

counterclaim and we will hereafter refer to them collectively as A-1 Auto Parts real estate or property.

In No. 40386, filed on April 8, 1975, Jim Marco was plaintiff and Dorothy Marco was defendant. Jim Marco there asks to have a constructive trust declared as to certain property, the address of which is 7401 Sarpy Avenue and which we will hereafter refer to as "Jim's house." In No. 40387, also filed on April 8, 1975, Jerry Marco is plaintiff and Dorothy Marco is defendant. Jerry Marco there asks to have a constructive trust declared in certain real property, the addresses of which are 7202 and 7204 South 25th Street and which we will hereafter refer to as "Jerry's house and building." Previous to trial the court permitted Jerry and Jim to amend their petitions in Nos. 40386 and 40387 to include the property described in their counterclaim in No. 40385, to wit, the A-1 Auto Parts property.

The evidence in cases No. 40386 and No. 40387 and on the counterclaim in No. 40385 was heard first and, at the close of the presentation of evidence by Jerry and Jim in those cases, Dorothy moved for a dismissal on the ground that the evidence was insufficient to establish a constructive trust. The trial judge granted the motion and dismissed the petitions and counterclaim of Jerry and Jim. It is the propriety of this action of the trial court which is before us on appeal. The only assignment of error relates to that proposition.

Following the granting of the motion to dismiss, Dorothy presented the evidence on her petition in No. 40385. The trial court granted the injunction for which she prayed. Jim and Jerry have not appealed from that ruling.

In our review of the cases before us we are guided by the following principles of adjective law: "In an equity suit, when the defendant moves for a dismissal of the plaintiff's action at the close of plaintiff's evidence he thereby admits plaintiff's evidence to be true, together with every inference which fairly and reason-

ably may be drawn therefrom, and where the plaintiff's evidence meets the burden of proof required and plaintiff has made a prima facie case, the motion to dismiss should be overruled. . . . In an equity suit, a motion to dismiss at the conclusion of the plaintiff's evidence affords a proper means of determining the sufficiency of the plaintiff's evidence to make a prima facie case. . . . Where it appears that such dismissal of a plaintiff's cause of action was erroneous, the parties are entitled to be placed in the same position they were in before the error occurred, which requires the cause to be remanded for a new trial." Paul v McGahan, 152 Neb. 578, 42 N. W. 2d 172. In the above case we said that the case comes to this court for trial de novo subject to the foregoing rules. We must, therefore, determine, as a question of law, whether the evidence is sufficient to support a judgment for Jerry and Jim.

The applicable principles of substantive law are found in the same case: "Constructive trusts arise from actual or constructive fraud or imposition, committed by one party on another. Thus if one person procures the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds toward the owner of the legal title, obtains such title from him upon more advantageous terms than he could otherwise have obtained it, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. If a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title." Paul v. McGahan, *supra*.

We must accordingly first summarize the pertinent

allegations of the pleadings by which Jim and Jerry state their causes of action and then review their evidence and examine the possible reasonable inferences therefrom. We treat their pleadings collectively since the general allegations relied upon to establish constructive trust are essentially the same in each case. We mention especially at the end of this summary of the pleadings the allegations peculiar to the individual cases.

The petitions allege: At various times between 1967 and 1971 Dorothy and Lawrence acquired title to the A-1 Auto Parts real estate; for about 20 years before the death of Lawrence, Jim and Jerry worked for their father in the business of A-1 Auto Parts; they were not paid regular salaries; their uncompensated labors were the source by which the real estate upon which the A-1 Auto Parts business is conducted was obtained; the plaintiffs at all times reposed great trust and confidence in their father and believed their father would deal justly with them; their father told them repeatedly "that it was his intention that the real estate . . . should pass to . . . [Jim and Jerry on his death] in consideration of . . . services performed [by Jim and Jerry] in connection with . . . A-1 Auto Parts"; except for the contributions made by Jim's and Jerry's services, all contributions to the acquisition of the property were paid by Lawrence, and Dorothy contributed nothing; Dorothy was a grantee of the property solely as a matter of convenience; Lawrence desired the property be conveyed by Dorothy to Jim and Jerry after his death and he had the same desire with reference to the business itself; a relationship of trust and confidence existed between Lawrence and Dorothy; Lawrence believed Dorothy would comply with his wishes and he would not have permitted Dorothy to be a grantee if he had known she would not; Dorothy acquired her title to the property by abuse of a confidential relationship; she holds the property as constructive trustee; and she refuses to convey

the same to Jim and Jerry although they have demanded that she do so.

In addition, it is alleged the property referred to as Jim's house was acquired by Dorothy and Lawrence on September 5, 1967; Jim inhabited that premises as his residence and erected improvements thereon; and the improvements were made in reliance on the intention of Lawrence to convey the property to Jim.

The property referred to as Jerry's house and building was acquired on June 26, 1971, by Dorothy and Lawrence as joint tenants with right of survivorship; Jerry inhabited a residence thereon and erected substantial improvements; and the improvements were made by Jerry in reliance on Lawrence' intention that the property be conveyed to him.

We now turn to a review of the evidence. In so doing we bear in mind that the motion of Dorothy to dismiss admits the truth of the evidence presented by Jim and Jerry and all the reasonable inferences therefrom. Certain background information is undisputed. A good deal of the testimony by the witnesses is ambiguous, vague, and in the form of conclusions with foundation lacking. This is particularly true with respect to the times when certain conversations are said to have occurred. We will necessarily for the most part summarize this evidence in a conclusionary way, while recognizing that we must concede its truth and the truth of any reasonable inferences therefrom.

Viewed in this light the question for our determination is whether the evidence supports the reasonable conclusion that Dorothy obtained title to the real estate in question by abuse of a confidential relationship under such circumstances that she ought not, according to the rules of equity and good conscience, hold and enjoy the benefits thereof, but should be held to be a constructive trustee of title for the benefit of Jim and Jerry.

The record discloses that Mary Marco, the first wife of Lawrence and the mother of Jerry and Jim, died when

Jim, the youngest, was 18 months of age. Jerry was 2 years older. After his mother's death, Jim lived with and was raised by a grandfather. Jerry apparently continued to make his home with his father. Lawrence married Dorothy in 1946 while Jerry was very young. Lawrence and Dorothy had 12 children, 11 of whom were still living at the time of trial and the youngest of whom was 2 years of age when Lawrence died suddenly in October of 1973.

Jerry, when he was about 12 years of age, began to work for his father in an automobile service station which the father operated. Jim began to do the same type of work shortly thereafter. As an adjunct to the service station business, the father ran a junk car operation. Jerry learned to cut up junkers with a torch. This was in about 1952. Jerry quit school in the twelfth grade. Jim quit school in about the eighth grade.

In 1959 or 1960 the business known as A-1 Auto Parts began as an outgrowth of the junk car business. It consisted apparently of the purchase of old automobiles and the salvage and sale of parts therefrom. In this business Jim ran the office and Jerry the salvage of parts. Lawrence, the father, at least in the later years, did the hauling.

While the two boys were minors neither got a regular salary although apparently they were furnished with a living, money for incidentals, and the use of an auto or automobiles.

When Jerry was about 21 years of age he married and he began to draw a salary of $60 per week. A year later he moved to an existing basement residence located on the same real estate on which "Jerry's house and building" were later constructed. In 1964 he bought a store building and moved it to the above premises. At that time the property was not owned by Dorothy and Lawrence, but apparently was held by lease. Using the building which he had purchased, Jerry began the construction of his house on the leased premises and

finished it in about 1969. He testified that the cost was about $8,000. This real estate was purchased by Lawrence and Dorothy in 1971 for $18,000. They took title as joint tenants with right of survivorship. In 1972 and thereafter Jerry constructed at 7204 South 25th Street, on the same tract of real estate above described, what has been referred to as Jerry's building. The cost was about $12,000. The evidence supports the conclusion that Jerry furnished the money for all these improvements although his father cosigned with him for money borrowed at a bank. At no time did Jerry pay real estate taxes on the land or rental therefor. Insurance on the property was paid from the A-1 Auto Parts business account. One witness testified that on one occasion Lawrence stated he had given Jim and Jerry the property on which "Jerry's building" was located.

Jerry continued to work for A-1 Auto Parts until his father's death. His wages at that time were $115 per week. After Lawrence died Dorothy contemplated raising the salary to $175, but a dispute over the estate of Lawrence occurred and Jerry was fired. Before the firing occurred and after Lawrence' death, Dorothy told Jerry that she would leave the real estate where the house and building were located to him when she died.

Jerry has, since the death of his father, filed a mechanic and materialman's lien for the materials and labor he furnished in the above construction. The lien claimed for the house is $18,500 and the claim for the building is $27,000. Jim joined in this lien. Jerry has also filed a claim against the estate, apparently for the same items.

Jim worked in A-1 Auto Parts from about 12 years of age until some time in 1969. When he reached 21, he began receiving take-home pay of $41.25. He married at age 26 at which time his wages were raised to $80 per week. After some time off in 1969 for reasons of health, Jim began the A-1 Auto Sales business across the street from A-1 Auto Parts. The real estate on

which that business is located was, at the time of Lawrence' death, owned by Lawrence and Dorothy as joint tenants. The record does not disclose the date of acquisition.

Jim started living at 7401 Sarpy Avenue in 1966. The house located on the premises was in a state of disrepair. Jerry's grandfather had lived there beginning in 1916. The land belonged to the railroad and was leased from it. Jim made improvements with his own funds and labor on the property for over a period of 6 or 7 years, spending about $6,000. These improvements began before Dorothy and Lawrence acquired title to this property from Dorothy's parents in 1971.

Jerry and Jim testified that income from A-1 Auto Parts was used to acquire all the real estate in question.

Jim and Jerry have joined in filing a mechanic and materialman's lien in the amount of $18,000 for the improvements made on the real estate on which "Jim's house" is located and have filed a claim against the estate of Lawrence for the same amount.

When Lawrence died he had a will in which he left everything to Dorothy. Although the date of the execution of the will is not shown by the evidence, it appears to have been before any of the real estate in question was acquired. Shortly before his death, Lawrence mentioned to a close friend and confidant that he did have a will. This will has been admitted to probate.

Jim and Jerry testified that they were told by their father that they would get the A-1 Auto Parts property and their own houses and building when he died. Both Jim and Jerry knew before their father's death that Dorothy's name was on some of the real estate, but they did not know how much. They expected to be protected in "their stuff." They stated that their father told them that he did not deed the property to them because if they should be divorced their wives were likely to get the property.

Jim and Jerry at first claimed to be part owners of

A-1 Auto Parts, but have since apparently abandoned that position. The income from the A-1 Auto Parts business and all other property was reported on the income returns of Lawrence and Dorothy. Lawrence and Dorothy were listed as the owners of the trade-name "A-1 Auto Parts" on a registration certificate executed in November 1959. In a renewal of this trade-name on June 11, 1969, Lawrence and Dorothy are listed as the applicants. The application describes the general nature of the business as new and used auto parts, used cars sold, and dismantling of same. The verification on the renewal was executed by Dorothy and Lawrence before Jerry A. Marco as a notary public. Jim paid no real estate taxes or rent on the property which he claims. Insurance thereon was paid by A-1 Auto Parts income. Witnesses testified that Lawrence had told them that Jim and Jerry were each owners of a one-third interest in the A-1 Auto Parts business.

Jerry still occupies his home. Jim still occupies his house and also continues to carry on the A-1 Auto Sales business on the property owned by Dorothy.

Jerry and Jim, through testimony of a friend of their father, introduced statements made by their father before his death. The time these statements were made is uncertain: "Like from about '60 to the time he died." The first conversation was "Probably back in the 50's. . . . They [the boys] was little then." Statements of Lawrence relating to the boys and A-1 Auto Parts were also introduced by the same witness in the following language: "Well, everything he would say was about the business would be 'me and the boys. The boys, I mean they're the ones that helped me and got going to where I'm at today.' . . . Mr. Marco said that he believed that Jerry ought to have an opportunity to have another business, whatever he wanted to put in that building, like Jimmy did putting a garage up across the street from A-1 Auto Parts, which is A-1 Service, selling cars. And he didn't blame the boys for trying to expand

and get something else besides A-1 Auto Parts. Q. What, if anything was said about . . . anything. A. Well, that was Jerry's home and Jimmy's home. . . . Well, Jimmy remodeled his and Jerry moved a building from over on 60th and 'L' Street, which was a beer joint at one time, when they made the big 'Y' there, and put a building on it and did all the improvements in it. So it was his home, according to Mr. Marco. And Mrs. Marco felt the same way."

Testimony was adduced as to a conversation between Dorothy, Jim, and Jerry which took place after Lawrence' death. The purpose of the testimony apparently was to show that Dorothy had made admissions against her interest. The substance of the conversation apparently was that Dorothy indicated her willingness to deed to Jim the real estate on which his house sits and to Jerry the real estate on which his house and building are located if the two would relinquish their claims to the A-1 Auto Parts business and real estate and the A-1 Auto Sales real estate which at that time they seemed to be claiming. Jim and Jerry apparently were then unwilling to relinquish their claims on this other property. This part of the conversation can only be construed as an offer to compromise a disputed claim. It certainly cannot by itself be reasonably construed as an admission by Dorothy of facts which would make her a constructive trustee.

Jim also testified as follows: "Q. Did you have any conversation with her about your house as to any interest she might have in it? A. It always was to be mine. With her, yes. There was really no question. Q. What about the Sales? A. And that was to be mine, there was no question. Q. But there was a discussion on the Auto Parts, wasn't there? A. Well, he wanted the rest of the kids to come in, too, with us, a share of it. Q. Well, wasn't she going to participate in it? A. Yeah. Well, the feeling was that there was a third there for — We was to work it and the third, other third, was to

provide for the other kids." This testimony is ambiguous in the extreme, but as we read it de novo, the answers taken together seem not to be admissions by Dorothy but a restatement of previous claims which Jim had made.

Part of the underpinning of the claims of Jerry and Jim is their assertion of contributions to the cost of acquisition of the real estate in question by reason of their services to A-1 Auto Parts for which they have not been compensated. As previously indicated, they also seem to have originally asserted that they were part owners of A-1 Auto Parts and thus it was their income that was used in part to acquire the real estate. The evidence does not make a prima facie case supporting these claims. During their minority their services and any income therefrom belonged as a matter of law to their father. Thereafter, they were paid regularly. There is no evidence of any agreement, direct or by implication, that they received less pay than they otherwise would have in consideration of being compensated later in some other way. The claim that they were part owners of A-1 Auto Parts supported only by testimony as to statements made by Lawrence is not legally supportable when considered with their own contradictory evidence. During most of the period of their services, to wit, from about 1952 to 1967, the A-1 Auto Parts real estate was merely leased; and there could not have been during that time any agreement that the services rendered were in consideration of a promise to convey property not then owned and the acquisition of which, so far as the record shows, was not even then contemplated. The same is true with reference to the other two tracts of real estate involved on this appeal.

There is little evidence in the record as to circumstances surrounding the drafting and execution of the deeds by which Lawrence and Dorothy acquired title as joint tenants. In addition to the two properties here involved, there was much other real property acquired

by Lawrence and Dorothy and title taken in the same fashion. None of the deeds are in evidence. The witnesses were permitted to testify, or it is simply conceded, that the various properties were so acquired and held. The only direct testimony as to circumstances of acquisition comes from the seller of the 4 ½-acre tract on which "Jerry's house and building" are located. The substance of that witness' testimony was that a purchase agreement was drawn. He could not remember whether or not Dorothy was a party to the purchase agreement. However, he was instructed, apparently by Lawrence, that the deed was to be made to Lawrence and Dorothy as joint tenants and this was done. At the time the decision was made Lawrence and Dorothy were apparently together in a trailer house, the location of which the record does not show. The seller seemingly waited outside the door while the decision to purchase was being made by Lawrence and Dorothy.

When a husband and wife take title to property as joint tenants, even though one pays all the consideration therefor a gift is presumed to be made by the spouse furnishing the consideration to the other who did not. This presumption is rebuttable. Hoover v. Haller, 146 Neb. 697, 21 N. W. 2d 450; McCormick v. McCormick, 150 Neb. 192, 33 N. W. 2d 543. That presumption is not rebutted by the evidence here, even assuming its truth and the reasonable inferences therefrom.

The record is completely devoid of any evidence, direct or by inference, to show that Dorothy was named as a grantee in the deeds through some abuse of a confidential relationship. When the deed of 1967 was made, Dorothy and Lawrence had been married for more than 20 years. They then had a large family. At least one child was born after that time. When the deed of 1971 was made they had been married about 26 years. It was at about that time their youngest child was born. Eighteen thousand dollars was paid for the last-mentioned acquisition and the evidence is completely de-

void of anything which would support an inference that any of this money was Jerry's. There is no evidence in the record whatever as to the circumstances surrounding the acquisition of the property acquired from Dorothy's parents and on which "Jim's house" is located.

The evidence therefore does not establish prima facie that Dorothy obtained title by virtue of a confidential relationship, under such circumstances that she ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits of title to the property in question. Under the circumstances shown, equity need not raise a trust by construction upon the legal title to the real estate in question.

Lawrence may well have intended, and we must accept on the basis of the record, that he did orally express his intention that Jerry was to have his home and building and Jim his home, but this alone is not enough to raise a constructive trust in the real estate. If it were, then no deed and no will would be secure. There is nothing in the record to show that such intention was communicated to Dorothy or that she took title with some agreement with reference thereto. We, of course, do not pass on matters not before us in this case. If the two sons are entitled to some relief, it is not in the form of requiring Dorothy to convey to Jerry the legal title to the 4½ acres of land on which his "house and building" are located, nor by requiring Dorothy to convey to Jim the 10 lots on which "his house" is located and to the two of them a two-thirds interest in the A-1 Auto Parts real estate.

AFFIRMED.