DONOVAN FORD ET AL., APPELLEES, V. DAROLD L. JORDAN AND LOIS E. JORDAN, HUSBAND AND WIFE, APPELLANTS. DAROLD L. JORDAN AND LOIS E. JORDAN, HUSBAND AND WIFE, APPELLANTS, V. AUGUST ROSS, INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE ESTATE OF HAZEL FORD, DECEASED, APPELLEE.
370 N.W.2d 714

Filed July 19, 1985.   Nos. 84-355, 84-356.

William J. Riley and Nick R. Taylor of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellants.

Annette E. Mason, Bruce G. Mason, and Mary Lou Kubichek of Ross & Mason, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

The last will of the deceased Hazel Ford named her stepson, Donovan Ford, stepmother, Maude Clifton, and nephew, Jerry T. Clifton, the beneficiaries of her estate. The beneficiaries brought an action to impress a constructive trust on certain personal and real property which Hazel Ford had placed in joint tenancy with Darold L. and Lois E. Jordan, husband and wife, alleging that the Jordans had breached their confidential relationship with Hazel Ford. In turn, the Jordans brought a replevin action against the special administrator of Mrs. Ford's estate, attorney August Ross, alleging that he had taken

possession of personal property belonging to the Jordans. After a jury was waived in the replevin action, both cases were consolidated and tried to the court. The trial court entered judgments impressing a constructive trust on the joint tenancy properties and ordering an accounting and transfer of the legal titles in and to the jointly held properties, in accordance with Mrs. Ford's will. The replevin action was dismissed. The assignments of error discussed in the Jordans' brief argue that the evidence does not support the imposition of a constructive trust on the jointly held properties nor the dismissal of the replevin action. We reverse and remand with the directions that the beneficiaries' action be dismissed and that judgment in the replevin action be entered returning to the Jordans the jointly held personal property.

We must first settle upon the scope of the reviews to be applied in these appeals.

A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof. *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983); *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978). Thus, the beneficiaries' suit is one in equity, which we review de novo on the record, giving consideration, where the evidence is in conflict, to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite. *Peterson v. Gering Irr. Dist.*, 219 Neb. 275, 363 N.W.2d 141 (1985).

On the other hand, replevin is a law action. Therefore, the cause having been tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Schmode's, Inc. v. Wilkinson*, 219 Neb. 209, 361 N.W.2d 557 (1985).

We now turn our attention to the facts. Mrs. Ford, a resident of Omaha, Nebraska, died on November 20, 1982, at the age of 77, by which time she had accumulated some stocks, tax-exempt bonds, and savings certificates which were kept at

the United States National Bank in a safe-deposit box leased jointly by Mrs. Ford and the Jordans. Mrs. Ford had also acquired a personal residence which was titled in her name jointly with the Jordans. The value of Mrs. Ford's holdings totaled somewhat over $150,000. The parties agree that approximately two-thirds of the total holdings were titled in and to Mrs. Ford jointly with the Jordans, the remainder being subject to the terms of the Ford will.

Mrs. Ford's stepson lived in California until approximately 6 months prior to her death, when he moved back to Omaha to live with his stepmother and help her with her affairs. During the time he lived in California, he and his stepmother kept in frequent contact, and he characterizes himself as Mrs. Ford's "stepson and best friend."

The nephew is a psychiatrist who lived in California at the time of Mrs. Ford's death. He corresponded regularly with his aunt and visited her in Omaha at least once a year. He described his relationship with his aunt as "close and loving," and testified it was an important relationship for him.

Mrs. Ford's stepmother was living in California at the time of her stepdaughter's death and has since died.

The Jordans, also residents of Omaha, had met Mrs. Ford in the 1950s when she was working as a housekeeper for Mr. Jordan's mother. The Jordans saw Mrs. Ford only occasionally until 1976, when their relationship began to grow. As a result, the Jordans helped Mrs. Ford maintain her residence, gave her advice about major expenditures and about her investments, drove her to doctor appointments and to the grocery store, and generally helped her take care of her personal and business affairs.

Mr. Jordan had been a claims representative for the Metropolitan Utilities District for 24 years and had property management experience. Mrs. Jordan had secretarial experience, worked for an insurance adjusting firm for 24 years, had underwriting experience, and had also worked in the insurance and vault departments of a savings and loan institution.

After the death of her brother, Mrs. Ford, being unhappy with the administration of his estate, became concerned about

the handling of her own affairs. The Jordans recommended an attorney to Mrs. Ford, as she was relying on the Jordans for advice and wanted them to become aware of her affairs. She and the Jordans then met with the attorney, who concluded that Mrs. Ford was not an experienced business person and that one of her concerns was how her property would be managed while she was still living, if she were to become unable to do so herself. At that time Mrs. Ford's stock was held solely by her, and some bank accounts were held jointly with some of her relatives. The attorney explained the consequences of joint ownership to Mrs. Ford and convinced himself that she understood the concept. The attorney also explained the operation of a durable power of attorney. He then drew a will and durable power of attorney in accordance with Mrs. Ford's instructions. The will named Mr. Jordan, or if he did not so act, Mrs. Jordan, as personal representative of the estate. The durable power of attorney named Mr. Jordan as attorney in fact. The documents were signed on August 7, 1976.

During 1976, Mrs. Ford added the Jordans' names to her United States National Bank checking account and to her safe-deposit box.

In 1979 Mrs. Ford sent a letter to her stepson, with a copy of her will, and stated in part: "My will is a simple will . . . . [E]verything is divided equally between you, Jerry and Bobby [Maude Clifton] . . . ." Mrs. Ford also expressed concern about the way her affairs would be handled if she were incapacitated, and wrote:

> They [the Jordans] are cosigners on all my banking business. They help me out on all business transactions, and have power of attorney to look after me in case I am not able to look after or take care of my own business or myself. . . . This is the best way to have it, so if anything happens to me, the state can not come in & tie up or freeze everything.

In the period from 1979 to her death, Mrs. Ford carried out, through the Jordans, several transactions which consisted of either transferring title to existing accounts, stocks, and bonds standing in her name alone to joint tenancy with the Jordans or purchasing assets and placing them jointly in her name and that

of the Jordans. Mrs. Ford did not solicit advice independent from that of the Jordans. The stockbroker involved in the transactions was selected by the Jordans and had no contact with Mrs. Ford. The Jordans read and took care of the business mail Mrs. Ford received regarding their joint interests. Mrs. Jordan balanced Mrs. Ford's checkbook each month and kept an extensive record of all of Mrs. Ford's business transactions, which was separate from Mrs. Ford's own records and more complete than the records kept by Mrs. Ford. About half of these transactions were conducted prior to April of 1982, by which time Mrs. Ford's eyesight had failed to the point that, in the opinion of an ophthalmologist, she would not have been able to read legal documents such as joint tenancy agreements or deeds.

On October 19, 1982, Mrs. Ford changed the title to her residence, having a value of about $20,000, from her name only to joint tenancy with the Jordans. Mrs. Ford's stepson testified that Mrs. Ford had previously said that she would like to change the names on the property because she did not want her relatives to have to come from California to sell the house when she died. The stepson further testified that he had a conversation with Mr. Jordan wherein Jordan agreed that the title to the house should be changed to joint tenancy so that no one would have to come back to sell it. Mr. Jordan denied that the conversation took place. Mrs. Jordan, in her deposition, said that Mrs. Ford informed her that she wanted to change the title on the property, so Mrs. Jordan drew the deed, had it executed, and caused Mr. Jordan to record it.

Although Mrs. Ford was described by her nephew as "very spry" in 1976, and by her stepson as independent and stubborn, her health began deteriorating in 1981. Mrs. Ford was hospitalized five times in the period from July 1981 until her death. The medical records show that Mrs. Ford was troubled with severe abdominal pain and bronchitis. She had lost considerable weight, and because of cataracts had gotten to the point by the summer of 1982 that she could read only the large "E" on a standard eye chart. She was scheduled for eye surgery but became ill and died before it could be performed.

A psychiatrist other than her nephew, testifying on the basis

of a review of the medical records, stated that although Mrs. Ford remained competent and able to reason, he would characterize her as a "[f]rail lady; prematurely old for her age; . . . failing as far as general vigor." He concluded that Mrs. Ford was beginning to feel somewhat overwhelmed and lonelier. He further testified that, in his opinion, Mrs. Ford had become more vulnerable and dependent during 1982. In the opinion of a treating physician, Mrs. Ford was suffering from reactive depression.

The beneficiaries make no allegation that the joint tenancy ownerships came about by the practice of any undue influence on the part of the Jordans. Rather, they allege that Mr. Jordan had become a close confidant and advisor to Mrs. Ford, that Mr. Jordan was Mrs. Ford's attorney in fact and that the Jordans were the named personal representatives of Mrs. Ford's estate, by which reasons the Jordans occupied a confidential relationship with Mrs. Ford, and that the joint tenancy ownerships came about as the result of an unspecified abuse of that relationship.

We have said that a constructive trust may arise by operation of law where legal title is acquired by virtue of a confidential relationship between the grantor and the grantee and under such circumstances that the grantee ought not, according to the rules of equity and good conscience, hold the benefits. Where such circumstances exist, a court of equity will raise a trust by construction and convert the grantee into a trustee of legal title for the benefit of the grantor. The burden of proof is upon one seeking to establish the existence of a constructive trust to do so by evidence which is clear, satisfactory, and convincing in character. *Fleury v. Chrisman*, 200 Neb. 584, 264 N.W.2d 839 (1978); *Marco v. Marco*, 196 Neb. 313, 242 N.W.2d 867 (1976); *Lukowski v. Deleski*, 190 Neb. 771, 212 N.W.2d 577 (1973); *Slocum v. Bohuslov*, 164 Neb. 156, 82 N.W.2d 39 (1957). Further, the existence of a constructive trust is to be determined by the particular facts, circumstances, and conditions of the individual case. *Guynan v. Guynan*, 208 Neb. 775, 305 N.W.2d 882 (1981).

Assuming for purposes of our analysis that a confidential relationship existed between Mrs. Ford and the Jordans by

virtue of the continuous trust placed by the former in the skill and integrity of the Jordans, as claimed by the beneficiaries, *First National Bank in Sioux City v. Curran*, 206 N.W.2d 317 (Iowa 1973), the question becomes whether there is "clear, satisfactory, and convincing" evidence that the Jordans abused that relationship such that a constructive trust must be placed on all of the property held jointly by Mrs. Ford and the Jordans. We find there is not.

There is no evidence the Jordans violated any instructions given them by Mrs. Ford. Nonetheless, the beneficiaries ask us to conclude that such confidential relationship as may have existed was abused from the bare facts that the Jordans became the joint tenants of approximately two-thirds of Mrs. Ford's holdings and that Mrs. Ford was physically infirm and feeling dependent, vulnerable, and lonely during the latter part of her life. Such circumstances may certainly raise in reasonable minds a question as to whether the Jordans acted with the utmost good faith toward Mrs. Ford, but they fall short of meeting the quantum of evidence required to prove that the Jordans made dispositions of Mrs. Ford's property other than as the latter wished.

The fact that the attorney employed by Mrs. Ford was recommended to her by the Jordans fades into insignificance in view of the fact that Mrs. Ford drafted a will in favor not of the Jordans but of her relatives. That she understood the consequences of joint tenancy is established by the fact that after the will was executed she made changes in certain joint tenancy ownerships with her relatives. There is no evidence she ever lost that understanding. The execution of a durable power of attorney is consistent with Mrs. Ford's concern about the handling of her business affairs should she become unable to handle them herself.

The joint tenancy ownerships are as consistent with the conclusion that Mrs. Ford wished to reward the Jordans, who had given her day-to-day assistance and attention, rather than relatives who, for the most part, were leading their own lives elsewhere, as with the conclusion that the Jordans used their relationship to thwart Mrs. Ford's desires.

We determine, therefore, that the evidence does not clearly,

satisfactorily, and convincingly establish an abuse by the Jordans of the relationship, however characterized, that existed between them and Mrs. Ford. We determine also that the findings and disposition of the trial court in the replevin action were clearly wrong.

Accordingly, we reverse the judgment in the beneficiaries' suit (84-355) and remand that cause for dismissal. We also reverse the judgment of dismissal in the Jordans' replevin action against the personal representative (84-356) and remand that cause with the direction that judgment be entered consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, J., not participating.

GRANT, J., dissenting.

I agree with the court's statements as to the imposition of a constructive trust where "one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property." I also agree with the statement as to the scope of our review as set out in the majority opinion.

I respectfully dissent, however, from the majority's holding that the evidence in this case does not clearly and convincingly establish an abuse by the Jordans of the relationship that existed between them and Mrs. Ford and was cultivated by the Jordans. There is no question that in 1976 when Mrs. Ford met with a capable, impartial attorney (selected, however, by the Jordans) to draw her will, Mrs. Ford understood the nature and consequences of joint tenancy ownership. It should be here noted that on this early occasion the pervasive Jordan effect on Mrs. Ford was already in full bloom, because Mrs. Ford did not meet the attorney alone, but always in the presence of the Jordans. Later, many of Mrs. Ford's stocks and bonds were sold and others bought and placed in joint tenancy with the Jordans through the Jordans' stockbroker, whom Mrs. Ford never met.

On August 7, 1976, a will disposing of Mrs. Ford's estate in such fashion that her assets remained in her family was executed by Mrs. Ford. After that date, in my judgment, there began a systematic conversion of what might be termed as

testamentary assets directed to her family into joint tenancy assets between Mrs. Ford and the Jordans. The evidence shows that as Mrs. Ford aged, her eyesight and her once-clear understanding concerning joint tenancy dimmed, and the joint tenancy transfers to the Jordans increased. I believe the facts recited in the majority opinion fully support the conclusion I reach and that those facts, supplemented by other facts determined by the trial court, furnish more than ample evidentiary support for the trial court's conclusion that the Jordans abused their confidential relationship with Mrs. Ford to such a degree that, as stated in the trial court's written opinion, "equity must act in this case and the Court <u>finds</u> that the assets in question now held by the defendants must be placed in a constructive trust for the benefit and use of the plaintiffs."

As further specific examples of the Jordans' activities in this case, I join with the trial court in noting that during the psychiatric treatments that Mrs. Ford was undergoing in 1981, the medical records show that Mrs. Ford's daughter called the psychiatrist's office, stating that her mother "did not come in for appt because she has financial problems and can't afford any more expense." As noted by the trial court, Mrs. Ford did not have a daughter, and I agree with the trial court's inference that Mrs. Jordan canceled the medical visit. The trial court stated that "[t]his does not show the concern of a mother-daughter relationship testified to by Lois E. Jordan." I further agree.

I also believe it is significant that the Jordans completely disposed of the assets of Mrs. Ford's friend and lodger, Harold Courtier, who died shortly after Mrs. Ford. Mr. Courtier, while not as financially secure as Mrs. Ford, did have some assets and some relatives. Before his death, and while he was in a coma, his automobile was sold, utilizing Mrs. Jordan's signature as Mr. Courtier's, and his assets were distributed by the Jordans to those whom they determined were entitled to those assets—all without the intervention of any probate court. I believe the Courtier situation merely presaged this case.

I would affirm.

BOSLAUGH, J., joins in this dissent.