ROBERT G. GOTTSCH, DOING BUSINESS AS BOB GOTTSCH
FEEDYARDS, APPELLANT AND CROSS-APPELLEE, V. BANK OF
STAPLETON, A CORPORATION, APPELLEE, AND FIRST NATIONAL
BANK OF OMAHA, A CORPORATION, APPELLEE AND
CROSS-APPELLANT.

458 N.W.2d 443

Filed July 20, 1990.   No. 88-112.

Michael E. Sullivan and J. Patrick Deveny for appellant.

Waldine H. Olson, of Schmid, Mooney & Frederick, P.C., for appellee First National Bank.

No appearance for appellee Bank of Stapleton.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

## GOTTSCH V. CHURCHILL

In March 1979, Leslie Churchill, acting under a power of attorney from his wife, Phyllis Churchill, acquired 200 cows in South Dakota. On May 31, 1979, Robert G. Gottsch, doing business as Bob Gottsch Feedyards, filed an action against Churchills in the district court for Lincoln County, Nebraska,

and alleged that Churchills, by defrauding Gottsch, acquired funds for the 200 cattle purchased in March. In the Lincoln County fraud action, Gottsch did not claim any legal interest in the South Dakota cattle, but sought a money judgment on account of Churchills' fraud. Gottsch obtained a judgment for $190,350 on December 17, 1981, in *Gottsch v. Churchill*. Gottsch was unable to collect the Lincoln County judgment.

## GOTTSCH'S SUITS AGAINST THE BANKS

*Nature of Action.*

When Gottsch was unable to satisfy his Lincoln County judgment against Churchills, he filed an action on January 19, 1984, against the Bank of Stapleton and First National Bank of Omaha (FNB) in the district court for Logan County, Nebraska, to impose a constructive trust on each of the banks.

*Standard of Review.*

An action to impose a constructive trust is an equity action. *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988); *Ford v. Jordan*, 220 Neb. 492, 370 N.W.2d 714 (1985).

> In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 234, 410 N.W.2d 494, 497 (1987); *Frenzen v. Taylor*, 232 Neb. 41, 439 N.W.2d 473 (1989). See, also, Neb. Rev. Stat. § 25-1925 (Reissue 1989).

*Pleadings.*

In his second amended petition, Gottsch asserted in paragraphic form the fraud previously described in the Lincoln County action, namely, paragraph 4: Churchills defrauded Gottsch to acquire the 200 South Dakota cattle; paragraph 5: Churchills were joint venturers in the transaction with Gottsch;

and paragraph 6: The Churchill joint venture was conducted under the name "P. M. Churchill." Gottsch then alleged that the 200 head of South Dakota cattle, which were related to his fraud action in Lincoln County (*Gottsch v. Churchill*) and which had been acquired through Churchills' fraud on Gottsch, were later sold, with proceeds from the sales used by Phyllis Churchill to pay her indebtedness to the Bank of Stapleton and FNB. Gottsch further alleged that the Bank of Stapleton had notice that Gottsch "claimed an interest" in the fraudulently acquired cattle subsequently sold by Churchills. Also, Gottsch alleged that knowledge of the Bank of Stapleton was imputed to FNB. Therefore, Gottsch requested a constructive trust for the funds which came into the banks' possession on account of Phyllis Churchill's payments to the banks.

In its answer, FNB generally denied Gottsch's allegations and affirmatively raised the issue that FNB was a "bona fide purchaser for value and without notice" of fraud in reference to "payments received by [FNB] on the obligation owing from Phyllis Churchill . . . ."

*Summary Judgment.*

Gottsch requested a "summary judgment on paragraphs 4, 5, and 6 of his second amended petition" and asked the court to take judicial notice of "the bill of exceptions, pleadings, judgment and memorandum" in *Gottsch v. Churchill*, the Lincoln County fraud case in which Gottsch had obtained the $190,350 judgment against Churchills. The district court took "judicial notice of the complete court file" in *Gottsch v. Churchill* and stated that "[s]ince all of the allegations contained in paragraphs 4, 5, and 6 of the Plaintiff's Second Amended Petition in the instant case have been previously judicially determined in the Lincoln County District Court proceeding, the . . . Plaintiff's Motion for Summary Judgment is sustained."

Therefore, as a result of the summary judgment, Churchills' fraud on Gottsch was established in the proceedings against the banks.

*Phyllis Churchill's Borrowing History.*

To evaluate Gottsch's claim for a constructive trust, we must

examine Phyllis Churchill's history of borrowing money from the Bank of Stapleton and explore the "correspondent bank" relationship between the Bank of Stapleton and FNB.

Since 1967, Phyllis Churchill had borrowed money from the Bank of Stapleton in connection with her family's cattle-raising operations. In 1974, Phyllis and Leslie Churchill married and conducted their own cattle operations. In April 1977, Phyllis Churchill, already indebted to the Bank of Stapleton for $103,500, requested additional credit from the bank. Under the circumstances, the legal limit on a loan from the Stapleton bank was $105,000. However, Phyllis Churchill obtained a loan in excess of the $105,000 limit for the Bank of Stapleton when, on April 29, 1977, the Stapleton bank, as a correspondent bank of FNB, received funds through a "participation," or "overline," loan from FNB for Phyllis Churchill.

*Correspondent Banks.*

Donald Ostrand, manager of FNB's correspondent banking department between 1965 and 1985, explained the nature and role of a correspondent bank:

> The correspondent bank [here, Bank of Stapleton] is approached by a borrower [Phyllis Churchill] . . . and determines whether they are interested in having the borrower as a customer.
>
> If it involves funds in excess of what their legal limit is, they need a correspondent [FNB] to help them. Then they contact the correspondent and say, we have a customer A. This is what he is looking for or they are looking for. We can provide up to X amount of dollars. We are going to need your help for the overline portion, and are you interested. We say, Well, we are always interested, but send us the information in order that we may make a credit judgment, and so we make an independent credit judgment, and then we determine that we would be interested or would participate in that line.

Regarding the overline, or participation, loan to Phyllis Churchill, the Bank of Stapleton and FNB had various duties. As indicated by Ostrand, FNB made an independent credit judgment whether to participate in a line of credit to Phyllis

Churchill. FNB also set a $50,000 limit and the interest rate on the overline loan to Phyllis Churchill.

The Bank of Stapleton, in addition to informing FNB about possible participation in a loan, performed several services pertaining to the Phyllis Churchill overline loan. The Stapleton bank kept a separate ledger on the overline loan, had all the personal contact with Phyllis Churchill after FNB turned down Phyllis Churchill's request that she deal directly with FNB, prepared financial statements regarding Phyllis Churchill which were forwarded to FNB, supplied FNB with general information about Phyllis Churchill's business activity, and kept FNB informed relative to "important events" which might concern Churchill's overline account.

The Bank of Stapleton received .5 percent of the interest paid on Phyllis Churchill's overline loan, which, according to Clara Ewoldt, vice president of the Bank of Stapleton, was intended to cover the "paperwork and fees that the Bank of Stapleton would have in connection with the overline loan." The .5 percent was not "intended in any way to be a form of compensation, salary, bonus, or commission for [the Bank of Stapleton's] services." Although the Bank of Stapleton was not directly compensated for its work on overline loans, the correspondent bank relationship with FNB was, nonetheless, advantageous to the Bank of Stapleton because the relationship enabled the Stapleton bank to keep its customers when the legal loan limit for the Bank of Stapleton necessitated location of additional funds. Furthermore, while no Bank of Stapleton employee was ever simultaneously an employee of FNB, nevertheless, FNB suggested that, as a condition of FNB's becoming a participation lender, the Bank of Stapleton should hire "an experienced manager." FNB's suggestion resulted in the Bank of Stapleton's hiring Byron Keslar as its chief executive officer.

When FNB became a participation lender to Phyllis Churchill, FNB did not supply the Bank of Stapleton with a promissory note for the entire amount of Phyllis Churchill's indebtedness. Rather, a new note, payable to the Bank of Stapleton for the amount of the overline loan, was signed by Phyllis Churchill at the Stapleton bank. FNB sent the Bank of

Stapleton a participation certificate, which was filled out by an executive officer of the Stapleton bank and returned to FNB with a copy of the note for the overline loan. The participation certificate contained information regarding the amount of the overline loan, its due date, and collateral for the loan. Funds from the overline loan were not delivered directly to Phyllis Churchill, but were deposited in the Bank of Stapleton's account with FNB. Ewoldt described the Bank of Stapleton's account with FNB as the "[s]ame as [a] checking account. We have deposits and withdrawals." When funds were deposited in its FNB account, the Bank of Stapleton would then simultaneously deposit funds in Phyllis Churchill's account. To make payments on her overline account with FNB, Phyllis Churchill wrote checks payable to the Bank of Stapleton, which, in turn, paid FNB its proportionate share of a payment in accordance with the interbank participation agreement for the overline loan. Inferentially, the Bank of Stapleton's payments to FNB were made through checks deposited in the Stapleton bank's account at FNB.

From April 1977 until September 1982, Phyllis Churchill received overline loans in various amounts from FNB. If one of Phyllis Churchill's overline loans became due, the Bank of Stapleton renewed the loan without first contacting FNB so long as the amount of the overline loan was within the $50,000 limit set by FNB for 1979 and 1980. Keslar of the Bank of Stapleton characterized his autonomy in renewing Phyllis Churchill's overline loans: "[T]he boys down there [at FNB] told me to use my own judgment on those loans, and that's what I did."

*Proceeds From Sales of the South Dakota Cattle.*

In 1979, when Churchills bought 200 cows in South Dakota, Phyllis Churchill had an overline account with FNB. At various times in 1980, the Churchills sold some of the South Dakota cattle. Phyllis Churchill used the proceeds from those sales to pay her debts to the Bank of Stapleton and FNB. On March 3, 1980, the Bank of Stapleton received $80,686.80 from Phyllis Churchill, as payment of principal and interest on her underline account. Of the March 3 payment, $77,884.42 was traceable to

proceeds from sales of the South Dakota cattle purchased by Churchills.

Also, on March 3, 1980, Phyllis Churchill paid $5,297 on principal and interest in her overline loan from FNB, which funds were traceable to proceeds from sales of the South Dakota cattle. On October 27, 1980, Phyllis Churchill paid an additional $53,955.48 on principal and interest in her overline account. Of the $53,955.48 paid on October 27, $24,067.97 was traceable to sale proceeds from the South Dakota cattle. Therefore, as a result of the March and October 1980 payments by Phyllis Churchill, FNB received $29,364.97 in payment of principal and interest on Phyllis Churchill's overline account with FNB. The balance of Phyllis Churchill's overline account with FNB, after her payment on October 27, 1980, was "zero." However, Phyllis Churchill continued to borrow through her overline account and received additional funds, with an account balance of $44,500 as of March 20, 1981.

### The Banks' Notice of Gottsch's Lawsuit Against Churchills.

As previously mentioned, on May 31, 1979, Gottsch filed his fraud action against Churchills in Lincoln County, so that *Gottsch v. Churchill* was filed approximately 1 year before the Bank of Stapleton and FNB received funds traceable to the eventual sales of Churchills' South Dakota cattle.

On October 18, 1979, counsel for Gottsch sent a letter to Keslar and notified him about the possibility that Keslar's deposition might be taken in *Gottsch v. Churchill*. Keslar had heard "bad things" about Leslie Churchill; for example, Keslar "heard that he [Leslie Churchill] had had trouble in [Phyllis'] banks." Keslar also suspected that Gottsch's suit concerned Leslie Churchill's involvement in the South Dakota cattle transaction. On the question whether Keslar ever told anyone at FNB about *Gottsch v. Churchill*, Keslar recalled that "I think I did," but was unable to specify when he talked with an FNB representative concerning any litigation involving Churchills. Keslar gave the letter regarding *Gottsch v. Churchill* to Eugene Hynes, a lawyer for the Bank of Stapleton, who discussed the letter with Keslar and specifically pointed out that the lawsuit involved both the Churchills, not just Leslie. Keslar related to

Hynes that the case probably involved the South Dakota cattle transaction. After discussing the matter with Keslar, Hynes visited with other officials for the Stapleton bank regarding *Gottsch v. Churchill*. Although Hynes believed that he also mentioned the Gottsch-Churchill litigation to FNB employees, Hynes was unable to establish the exact date of such communication.

According to Ostrand, head of FNB's correspondent banking department, *Gottsch v. Churchill* first came to his attention when he received Phyllis Churchill's financial statement, dated March 26, 1981, which contained a notation that Phyllis Churchill had a lawsuit pending against her. Ostrand testified that he may have discussed *Gottsch v. Churchill* with Ralph Peterson, an employee of FNB who often had contact with FNB's correspondent banks. Peterson, on the other hand, testified that he learned about *Gottsch v. Churchill* in 1980 or 1981 through a conversation with Mick Brosius, an owner of the Bank of Stapleton.

Notwithstanding information about *Gottsch v. Churchill*, neither the Bank of Stapleton nor FNB placed any restrictions on Phyllis Churchill's underline or overline accounts. According to Ostrand: "[I]t was a situation that apparently the Bank of Stapleton was not concerned about from the bank's standpoint and therefore, we were not concerned about it if that was the case."

*District Court's Decision.*

In the setting of Churchills' fraud, which had been established in the summary judgment proceedings through the district court's judicial notice of the Lincoln County action (*Gottsch v. Churchill*), the court determined Gottsch's claim against the banks.

The district court determined that the Bank of Stapleton had actual knowledge of the Churchills' fraud on Gottsch and based that determination on the letter from Gottsch's lawyer in October 1979 which informed Keslar about *Gottsch v. Churchill*; the availability, as a public record, of the court file for the *Gottsch v. Churchill* court; and Keslar's suspicion that *Gottsch v. Churchill* concerned the South Dakota cattle

transaction. Since the Bank of Stapleton had received $77,884.42 which was traceable to proceeds from sales of Churchills' South Dakota cattle and was subject to a constructive trust, the court entered judgment for $77,884.42 in favor of Gottsch against the Stapleton Bank.

However, as a matter of law, the court concluded that knowledge of the Bank of Stapleton concerning Churchills' fraud was not imputable to FNB. Also, the court found that, without notice of Churchills' fraud, FNB's receipt of the $29,364.97 paid by Phyllis Churchill, which satisfied her indebtedness at the time of payment, and FNB's subsequent extension of credit to Phyllis Churchill constituted FNB as a "bona fide lender" protected against liability and the constructive trust sought by Gottsch. For that reason, the district court dismissed Gottsch's action against FNB.

Gottsch appeals; FNB cross-appeals; but the Bank of Stapleton has not appealed.

## GOTTSCH'S APPEAL

With fraud as an established fact through the summary judgment based on the district court's judicial notice of *Gottsch v. Churchill*, Gottsch contends that the Bank of Stapleton's knowledge of Churchills' fraud was imputed to FNB, and, therefore, Gottsch is entitled to judgment against FNB. Also, Gottsch contends that FNB's receipt of $29,364.97, which was paid by Phyllis Churchill and which satisfied Churchill's antecedent debt, does not constitute value for a bona fide transaction which precludes a constructive trust.

## CONSTRUCTIVE TRUSTS: NATURE, GENERALLY

*General Nature of a Constructive Trust.*

A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof. *Ford v. Jordan*, 220 Neb. 492, 494, 370 N.W.2d 714, 716 (1985); *Evertson v. Cannon*, 226 Neb. 370, 411 N.W.2d 612 (1987).

"A constructive trust is a relationship, with respect to

property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his acquisition or retention of the property would constitute unjust enrichment." *Knoell v. Huff*, 224 Neb. 90, 97-98, 395 N.W.2d 749, 755 (1986).

Also, this court observed in *In re Estate of Lienemann*, 222 Neb. 169, 177, 382 N.W.2d 595, 601 (1986):

> Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property, unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

As a fraud-rectifying remedy, a constructive trust, even in the absence of the trustee's participation in fraud, is available on the basis of the principle that one who accepts a product of fraud, knowing the means by which the fraud-caused product was achieved, is liable to the defrauded party, although the recipient of the product did not personally participate in the fraud. *Malakul v. Altech Arkansas, Inc.*, 298 Ark. 246, 766 S.W.2d 433 (1989); *Commercial Credit v. Beebe*, 123 Vt. 317, 187 A.2d 502 (1963); *Walters v. Maloney*, 758 S.W.2d 489 (Mo. App. 1988); *Beaton & Assoc. v. Joslyn Mfg. & Supply*, 159 Ill. App. 3d 834, 512 N.E.2d 1286 (1987); *Hruska v. First State Bank of Deanville*, 727 S.W.2d 732 (Tex. App. 1987).

*Burden of Proof.*

A party seeking the remedy of a constructive trust has the burden to establish the factual foundation, by evidence which is clear and convincing, required for a constructive trust. *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988); *Ford v. Jordan, supra.*

### IMPUTATION TO FNB

Regarding Gottsch's contention that knowledge of the Bank of Stapleton was imputed to FNB, the question is: Did the

correspondent bank relationship, under the circumstances, supply a legal relationship through which the Stapleton bank's knowledge was imputed to FNB?

We begin by noting that "[a]n agency is a fiduciary relationship, resulting from one person's manifested consent that another may act on behalf and subject to the control of the person manifesting such consent, and, further, resulting from another's consent to so act." *Dunn v. Hemberger*, 230 Neb. 171, 180, 430 N.W.2d 516, 522 (1988); *Oddo v. Speedway Scaffold Co.*, 233 Neb. 1, 443 N.W.2d 596 (1989). Whether an agency exists depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize or describe their relationship. See *Ginn v. Lamp*, 234 Neb. 198, 450 N.W.2d 388 (1990). " ' "The distinguishing features of agency are its representative character and its derivative authority. . . ." ' " *Anderson v. Valley Feed Yards, Inc.*, 175 Neb. 719, 722-23, 123 N.W.2d 839, 842 (1963); *Valentine Oil Co. v. Powers*, 157 Neb. 87, 59 N.W.2d 160 (1953).

In *Valentine Oil Co. v. Powers, supra* at 91, 59 N.W.2d at 163, this court described an agent as " 'a person authorized by another to act on his account and under his control.' " An agent has also been defined as " 'one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it. . . .' " *Watkins v. Waits*, 148 Neb. 543, 551, 28 N.W.2d 206, 210 (1947).

When FNB became a participation lender to Phyllis Churchill, FNB decided to extend credit to Phyllis Churchill on the basis of FNB's judgment and asserted its control over the overline loan to Churchill. Also, FNB set the $50,000 limit and the interest rate on the overline loan. However, after becoming a participation lender, FNB delegated to the Bank of Stapleton much of FNB's authority to act on Phyllis Churchill's overline account. The Bank of Stapleton carried out the day-to-day paperwork for the Churchill overline loan, including preparation of financial statements, and had nearly all the personal and direct contact with Phyllis Churchill. More

importantly, the Bank of Stapleton renewed Phyllis Churchill's overline loans without receiving FNB's prior permission for such renewals so long as a renewal loan was within the $50,000 limit set by FNB. Furthermore, FNB used the Bank of Stapleton as a source of information about FNB's overline customers, including Phyllis Churchill. For example, when asked whether FNB used a correspondent bank, such as the Bank of Stapleton, to obtain information regarding FNB's customers and overline accounts, including information about litigation involving a customer, Ostrand responded that "[u]nder the logistics, we have to. We couldn't keep up with all the filings. . . . I don't know of any correspondent or city regional bank that has a department that just follows filings. You have to rely upon your correspondent because they are your eyes and ears."

From the foregoing, it is clear that FNB actually delegated overline loan authority to the Bank of Stapleton and used the Stapleton bank in managing Phyllis Churchill's overline account. Thus, FNB expected the Bank of Stapleton to do more than simply handle paperwork on the overline loan. Strangely enough, FNB expressed that it would not become a participation lender with the Bank of Stapleton on the Phyllis Churchill loan "unless an experienced manager was hired for the day-to-day operations of running of the bank . . . because [FNB] wanted a chief executive officer that had banking experience." As the result of FNB's condition for its participation, the Bank of Stapleton hired Keslar as a bank officer meeting the qualifications expressed by FNB. Consequently, from our de novo review of the record, and contrary to the district court's finding, we conclude that an agency relationship actually existed between FNB and the Bank of Stapleton concerning the credit transactions with Phyllis Churchill.

## VALUE TO PRECLUDE A CONSTRUCTIVE TRUST

Gottsch contends that FNB's receipt of $29,364.97, paid by Phyllis Churchill and applied to satisfy the indebtedness of her overline loan, does not constitute value in a bona fide transaction which precludes a constructive trust. To support

this contention, Gottsch relies on *Meier v. Geldis*, 148 Neb. 561, 28 N.W.2d 140 (1947), which involved an attempt by Augusta and Beulah Meier to have George Geldis declared trustee for Meiers' benefit concerning certain funds in Geldis' possession. One John Owens had induced Meiers to make various loans to third parties. However, Owens deposited Meiers' checks, which represented the loan proceeds, in his checking account. Owens then drew checks on his account, which contained the funds traceable to the Meier loans, and delivered the checks to Geldis, who applied the checks to Owens' antecedent debt to Geldis. In *Meier*, this court stated:

> Where property, as here, has been acquired by fraud, equity, at the suit of the injured parties, will impress a constructive trust upon such property in their favor and, in the event of a prior transfer by the wrongdoer, will trace the property, if possible, through whatever mutations and impress a trust thereon in the hands of a third person, unless he be a bona fide purchaser for value and without notice. . . .

> By his conduct in obtaining these funds Owens became a trustee thereof ex maleficio and the question arises whether the antecedent indebtedness of the defendant is such a consideration as to make him a bona fide purchaser for value. The record shows he had no notice either as to the source or nature of the funds with which he was paid.

*Id.* at 565, 28 N.W.2d at 142. This court determined that Geldis was not a bona fide purchaser for value because of "the principle that an antecedent debt is not such consideration as to have the consequence of cutting off the trust against the funds applied to the satisfaction of the debt, although the creditor acts in good faith and without notice but has not changed his position." *Id.* at 566, 28 N.W.2d at 143. Thus, Meiers obtained a constructive trust over the traceable funds in Geldis' possession. Gottsch urges this court to apply the *Meier* principle regarding antecedent debt and determine that FNB is not a bona fide purchaser for value.

However, *Meier v. Geldis, supra*, was decided before Nebraska adopted the Uniform Commercial Code, which became effective in 1965. In *Meier*, Geldis became a "holder"

of the checks. " 'Holder' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." Neb. U.C.C. § 1-201(20) (Reissue 1980). Under the U.C.C., a holder may cut off a constructive trust if the holder is not a bona fide purchaser for value, but, rather, a "holder in due course." A "holder in due course" is a holder who takes an instrument for value, in good faith, and without notice that the instrument is overdue or has been dishonored or of any defense or claim against or claim to the instrument on the part of any person. Neb. U.C.C. § 3-302 (Reissue 1980). Furthermore, a "holder takes the instrument for value . . . when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due . . . ." Neb. U.C.C. § 3-303 (Reissue 1980). If *Meier v. Geldis* had been decided after Nebraska adoption of the U.C.C., Geldis clearly would have been a holder in due course, since he gave value, acted in good faith, and did not have notice of the Meiers' claim.

In Gottsch's case, the Bank of Stapleton became a holder when it received payment on the overline account from Phyllis Churchill on March 3 and October 27 of 1980. Accordingly, when the Bank of Stapleton negotiated an instrument to FNB for payment on the overline account, FNB became a holder entitled to protection from Gottsch's claim to proceeds from the sale of Churchills' South Dakota cattle provided that FNB qualifies as a holder in due course. FNB clearly received value, since Phyllis Churchill's checks of March 3 and October 27 were payments for an antecedent claim, namely, the balance due on her overline account with FNB. See § 3-303.

### DISPOSITION OF GOTTSCH'S APPEAL

Although an agency relationship existed between the Bank of Stapleton and FNB, a relationship through which the Stapleton bank's knowledge was imputable to FNB, we cannot order that a judgment be entered for Gottsch against FNB. The reason for this conclusion is contained in our disposition of FNB's cross-appeal.

## FNB'S CROSS-APPEAL

In its cross-appeal, FNB claims that the trial court erred in granting Gottsch summary judgment on the issue of Churchills' fraud.

FNB argues that collateral estoppel is inapplicable to prevent FNB's contesting Churchills' fraud determined in the Lincoln County proceedings. Although FNB's argument concentrates only on collateral estoppel, the method by which the trial court granted summary judgment implicitly raises two fundamental questions, namely, whether a trial court may use judicial notice to establish a material fact necessary for summary judgment and, if judicial notice is available for summary judgment, whether the court file in *Gottsch v. Churchill* is a proper subject for judicial notice.

*Summary Judgment and Judicial Notice.*

Regarding the information which a court may consider in reference to a summary judgment, Neb. Rev. Stat. § 25-1332 (Reissue 1989) provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See, also, *Hall v. Phillips*, 231 Neb. 269, 436 N.W.2d 139 (1989); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988).

We note that Fed. R. Civ. P. 56(c), as a basis for a useful comparison with § 25-1332, provides that a summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Similar to § 25-1332, judicial notice is not specifically mentioned in Fed. R. Civ. P. 56(c); nevertheless, federal courts may utilize judicial notice in determining the merits of a motion for summary judgment. See, e.g., *Clay v. Equifax, Inc.*, 762 F.2d 952 (11th Cir. 1985) (a district court, on a motion for summary judgment, may consider matters which are the subject of judicial notice); *St. Louis Baptist Temple v.*

*F.D.I.C.*, 605 F.2d 1169, 1171-72 (10th Cir. 1979) ("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment"); *Mid-South Grizzlies v. National Football League*, 550 F. Supp. 558, 570 n.31 (E.D. Pa. 1982) ("[j]udicial notice may be used in resolving a motion for summary judgment"); *Fed. Election Com'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 n.7 (S.D.N.Y. 1981) ("facts subject to judicial notice may be properly considered in a motion for summary judgment").

Furthermore, Neb. Evid. R. 201(6) states: "Judicial notice may be taken at any stage of the proceeding." In reference to Fed. R. Evid. 201(f), which is identical to Neb. Evid. R. 201(6), Weinstein and Berger state:

> The provision in subdivision (f) for taking judicial notice at any stage of the proceedings . . . means not only that a judge may dispense with formal proof of adjudicative facts at any time during the course of a litigation, but also that [the judge] must abide by the requirements of Rule 201 when doing so. Examples [include] the use of judicial notice in ruling on motions, commenting on the evidence, instructing the jury, making findings of fact and deciding appeals.

1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 201[6] at 201-47 (1989). The foregoing meaning of "proceeding" is consistent with the view in federal courts that judicial notice may be utilized for disposition of a motion for summary judgment.

Therefore, "proceeding," within Neb. Evid. R. 201(6), includes judicial activity which occurs after commencement of an action and includes judicial action in an appeal. See 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5110 at 522 (1977) ("[t]he trial court may take judicial notice during the pretrial stages under [Fed. R. Evid.] 201(f)"). See, also, *In re Estate of Casselman*, 219 Neb. 653, 655, 365 N.W.2d 805, 806 (1985) ("[w]e . . . take judicial notice of the record in *Casselman I* [previous appeal of the case]"). Cf. *Bank of Mead v. St. Paul Fire & Marine Ins. Co.*, 202 Neb. 403, 407-08, 275 N.W.2d 822, 825 (1979) ("it can hardly be argued

that this appellate court cannot now take judicial notice of its own records in . . . two prior related cases").

From the foregoing, we conclude that a trial court may use appropriate judicial notice in resolving a motion for summary judgment. Thus, we now address the issue whether the district court's use of judicial notice was proper in the present case.

Neb. Evid. R. 201(2), Neb. Rev. Stat. § 27-201(2) (Reissue [1989]), pertains to judicial notice of adjudicative facts and states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

A fact is adjudicative if the fact affects the determination of a controverted issue in litigation . . . .

. . . .

When neither of the alternative tests prescribed in Neb. Evid. R. 201(2) is satisfied, judicial notice of an adjudicative fact is improper. See *Cardio-Medical Assoc. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68 (3d. Cir. 1983). See, also, 1 J. Weinstein & M. Berger, *supra.*

A judge or court may take judicial notice, whether requested or not. Neb. Evid. R. 201(3).

*State v. Vejvoda*, 231 Neb. 668, 675-76, 438 N.W.2d 461, 467-68 (1989). In *Vejvoda*, we also stated that

[j]udicial notice of an adjudicated fact is a species of evidence, which, if relevant as an ultimate fact or a fact from which an ultimate fact may be inferred, is received without adherence to the Nebraska Evidence Rules otherwise applicable to admissibility of evidence and establishes a fact without formal evidentiary proof.

*Id.* at 676, 438 N.W.2d at 468.

*Judicial Notice and Collateral Estoppel.*

Regarding judicial notice of court records, this court has stated:

With respect to collateral estoppel we held in Johnson v. Marsh, 146 Neb. 257, 19 N.W.2d 366 [1945], that where

cases are interwoven and interdependent and the controversy involved has already been considered and determined in a prior proceeding involving one of the parties now before the court, the court has a right to examine its own records and take judicial notice of its own proceedings and judgment in the prior action.

*Peterson v. The Nebraska Nat. Gas Co.*, 204 Neb. 136, 138, 281 N.W.2d 525, 527 (1979); *In re Estate of Casselman*, 219 Neb. 653, 365 N.W.2d 805 (1985); *Cedars Corp. v. Sun Valley Development Co.*, 213 Neb. 622, 330 N.W.2d 900 (1983); *Reeves v. Watkins*, 208 Neb. 804, 305 N.W.2d 815 (1981).

From *Peterson, supra*, it is evident that this court has considered a court's judicial notice of its own records in relation to collateral estoppel.

According to M. Graham, Handbook of Federal Evidence § 201.3 at 72-73 (2d ed. 1986):

A court will take judicial notice of its own acts and records in the same case, of facts established in prior proceedings in the same case, of the authenticity of its own records of another case between the same parties, of the files of related cases in the same court, and of public records on file in the same court. In addition judicial notice will be taken of the record, pleadings or judgment of a case in another court between the same parties or involving one of the same parties, as well as the record of another case between different parties in the same court.

As expressed in McCormick on Evidence § 330 at 927 (E. Cleary 3d ed. 1984):

It would seem obvious that the judge of a court would take notice of all of the records of the institution over which he presides, but the courts have been slow to give the principle of judicial notice its full reach of logic and expediency. It is settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to matters occurring in the immediate trial, and in previous trials or hearings. The principle seemingly is equally applicable to matters of record in the proceedings in other cases in the same court, and some decisions have recognized this, but many courts

still adhere to the needless requirement of formal proof, rather than informal presentation, of recorded proceedings in other suits in the same court. Matters of record in other courts are usually denied notice even though it would appear manifest that these 'public documents are logically subject to judicial notice as readily verifiable facts.

See 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5106 (Supp. 1990).

Hence, as a subject for judicial notice, existence of court records and certain judicial action reflected in a court's record are, in accordance with Neb. Evid. R. 201(2)(b), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

However, as one court has expressed:

A distinction must be carefully drawn between taking judicial notice of the *existence* of documents in the Court file as opposed to the truth of the facts asserted in those documents. . . .

. . . [W]hile a Court may take judicial notice of each document in the Court's file it may only take judicial notice of the *truth* of facts asserted in documents such as orders, judgments, and findings of fact and conclusions of law because of the principles of collateral estoppel, res judicata, and the law of the case.

(Emphasis in original.) *In re Snider Farms, Inc.*, 83 Bankr. 977, 986 (N.D. Ind. 1988). See, also, *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987) (judicial notice of an adjudicative fact as a basis for collateral estoppel is subject to the fundamental requirement of due process and a litigant's opportunity to be heard); *Colonial Leasing etc. v. Logistics Control G.I.*, 762 F.2d 454, 459 (5th Cir. 1985) ("[c]are should be taken by the court to identify the fact it is noticing, and its justification for doing so. This is particularly necessary when a document, such as a court judgment, from which any number of distinct facts might be drawn, is the object of the notice"); *M/V American Queen v. San Diego Marine Const.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("[a]s a general rule, a court may not take judicial notice of proceedings or records in another cause so as to

supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it"); *United States v. Am. Tel. & Tel. Co.*, 83 F.R.D. 323 (D.D.C. 1979) (judicial notice of court records should be limited to the fact of their existence rather than the truth of the matters contained in the court records); *Texas Real Estate Com'n v. Nagle*, 767 S.W.2d 691, 694 (Tex. 1989) ("[a] court may take judicial notice of its own records and judgments, but the use to which such records may be put is circumscribed by the doctrines of res judicata and collateral estoppel").

It is clear that the

> doctrine [of collateral estoppel] imposes limits upon when a party can be bound by a determination of fact made in another case, limitations that would be meaningless if a party could not contest any fact that had ever been decided by any court in any litigation because of the rules of judicial notice.

21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5106 at 257 n.31.13 (Supp. 1990).

In *Jonathan Woodner Co. v. Adams*, 534 A.2d 292, 297 (D.C. 1987), the court stated:

> While it is true that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records," 21 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5106 (Supp. 1987), that does not necessarily imply that a court must therefore notice the truth of all facts that are ascertained in those records.

See, also, *Matter of Pima County Mental Health, etc.*, 149 Ariz. 7, 9, 716 P.2d 68, 70 (1986) ("[t]he rules of evidence allow the court to take judicial notice of the contents and disposition of a file, that the case exists and that allegations were made, but the court may not take notice of the truth or falsity of specific allegations except as established by final judgment").

Thus, a court may judicially notice existence of its records and the records of another court, but judicial notice of facts reflected in a court's records is subject to the doctrine of collateral estoppel or of res judicata.

In the present appeal, although the trial court was the district court for Logan County, the court could judicially notice the

existence of the court file for *Gottsch v. Churchill* in the district court for Lincoln County. Furthermore, the trial court could judicially notice the fact of the judgment obtained in *Gottsch v. Churchill*. However, the trial court could not judicially notice existence of Churchills' fraud unless, by virtue of collateral estoppel, Churchills' fraud was a previously adjudicated fact binding on FNB.

Collateral estoppel " 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *State v. Gerdes*, 233 Neb. 528, 530, 446 N.W.2d 224, 227 (1989) (quoting *Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970)).

> "Collateral estoppel may be applied where an identical issue was decided in a prior action, there was a judgment on the merits which was final, the party against whom the doctrine is to be applied is a party or is in privity with a party to the prior action, and there was an opportunity to fully and fairly litigate the issue in the prior litigation."

*State v. Gerdes, supra* at 530, 446 N.W.2d at 227 (quoting *State ex rel. Douglas v. Morrow*, 216 Neb. 317, 343 N.W.2d 903 (1984)).

The doctrine of collateral estoppel "recognizes that limits on litigation are desirable, but a person should not be denied a day in court unfairly." *Vincent v. Peter Pan Bakers, Inc.*, 182 Neb. 206, 207, 153 N.W.2d 849 (1967); *Woodmen of the World Life Ins. Soc. v. Peter Kiewit Sons' Co.*, 196 Neb. 158, 241 N.W.2d 674 (1976). Furthermore,

> [d]ue process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to a prior suit or as a privy; and, where not so, that at least the presently asserted interest was adequately represented in the prior trial.

*Hickman v. Southwest Dairy Suppliers, Inc.*, 194 Neb. 17, 28-29, 230 N.W.2d 99, 106 (1975); *Borland v. Gillespie*, 206 Neb. 191, 292 N.W.2d 26 (1980).

FNB asserts that collateral estoppel is inapplicable because FNB was not a party or in privity with a party in *Gottsch v. Churchill*. Gottsch argues that FNB "was in privity with a

party, Phyllis M. Churchill, in that [FNB] subsequently acquired an interest in the 200 cows which were the subject of the earlier case, specifically, the bank acquired $ 29,364.97 of the proceeds from the sale of those cows." Reply brief for appellant at 17.

"Privity depends upon the relation of the parties to the subject-matter, rather than their activity in a suit relating to it after the event. . . .

"Privity implies a relationship by succession or representation between the party to the second action and the party to the prior action in respect to *the right adjudicated in the first action.*"

(Emphasis supplied.) *Schurman v. Pegau*, 136 Neb. 628, 637, 286 N.W. 921, 925 (1939); *Midwest Franchise Corp. v. Wakin*, 201 Neb. 450, 268 N.W.2d 737 (1978); *Hickman v. Southwest Dairy Suppliers, Inc., supra.* See, also, *Consumers Public Power District v. Eldred*, 146 Neb. 926, 22 N.W.2d 188 (1946). Privity has also been defined as

[m]utual or successive relationship to the same rights of property. In its broadest sense, "privity" is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. . . . Derivative interest founded on, or growing out of, contract, connection, or bond of union between parties; mutuality of interest.

Black's Law Dictionary 1079 (5th ed. 1979). See, also, Restatement (Second) of Judgments § 43, comment *a.* at 2-3 (1982):

If the [prior] action is characterized as having involved only the "personal" rights of the litigants, it does not affect the property itself. The consequence of such a characterization is that a person who subsequently acquires property owned by one who was a party to litigation is not bound by the judgment (although he may, for example, take it subject to the lien of a money judgment against his predecessor in title). On the other hand, if the action is regarded as having concerned "property," the determinations in the action delimit the

property interest of the parties and therefore establish what passes to their successors to the interest.

In essence, Gottsch argues that FNB has privity with the Churchills as a successor in interest to the property involved in *Gottsch v. Churchill*. However, the court in *Gottsch v. Churchill* did not determine ownership of or any property interest in the 200 head of South Dakota cattle acquired by Churchills. Rather, the "right adjudicated" in *Gottsch v. Churchill* was Gottsch's personal right to a money judgment for damages on account of Churchills' fraud.

Certainly, FNB desired, similar to the Churchills' desire in *Gottsch v. Churchill*, to disprove fraud in the acquisition of the South Dakota cattle. However, for the purpose of issue preclusion, the mere fact that litigants in different cases are interested in the same question or desire to prove or disprove the same fact or set of facts is not a basis for privity between the litigants. *Am. Polled Hereford v. City of Kansas City*, 626 S.W.2d 237 (Mo. 1982). See, also, *Charvis v. Charvis*, 529 S.W.2d 814, 815 (Tex. Civ. App. 1975) ("[p]rivity is not established by the mere common interest of persons in the same question"); *Boring v. Miller*, 215 Tenn. 394, 386 S.W.2d 521 (1965) (an interest in proving the same set of facts involved in prior litigation is insufficient to establish privity); *Ruffinengo v. Miller*, 579 P.2d 342 (Utah 1978).

Gottsch's previous action against Churchills (*Gottsch v. Churchill*) was based on Gottsch's personal right to damages caused by Churchills' fraud and did not determine or involve the title to, or any property interest in, the South Dakota cattle, whereas Gottsch's action against FNB relates to property, namely, the South Dakota cattle in their converted form of traceable proceeds from the sales of the cattle. In view of the foregoing principles concerning collateral estoppel, we conclude that FNB was not in privity with Phyllis Churchill in *Gottsch v. Churchill*. Thus, the trial court erred in taking judicial notice of the court record in *Gottsch v. Churchill* to establish Churchills' fraud, a material fact which was established through summary judgment on the issue of Churchills' fraud and which was the basis for issue preclusion or collateral estoppel on the question of fraud.

## CONCLUSION

Although an agency relationship existed between the Bank of Stapleton and FNB, a relationship through which the Bank of Stapleton's notice of fraud was imputable to FNB, existence of the Churchill fraud was established by the district court's judicial notice as a basis for collateral estoppel. Since the district court's improper use of judicial notice in relation to collateral estoppel denied FNB an opportunity to contest the issue of Churchills' fraud, we reverse the district court's judgment in the action between Gottsch and FNB so that FNB may have its day in court on the question of Churchills' fraud.

Regarding a retrial, the existence of the agency relationship between the Bank of Stapleton and FNB has been determined in this appeal and will not be an issue for determination on retrial. Establishment of the agency relationship concomitantly establishes imputability as a consequence of the agency. However, since FNB, as a result of this appeal, is entitled to a new trial on the question of Churchills' fraud, FNB is entitled to litigate the entire issue and all aspects of the Churchill fraud, which necessarily includes the question of the Bank of Stapleton's notice about the fraud, although the district court has previously found that the Bank of Stapleton had notice of Churchills' fraud. There may be other aspects of notice to the Bank of Stapleton which were not explored or which were bypassed on account of the district court's judicial notice which conclusively established existence of Churchills' fraud. We will not speculate what facts might have a bearing on the question of the Bank of Stapleton's notice about Churchills' fraud, if such fraud actually existed. Rather, to correct the trial court's erroneous uses of judicial notice and the doctrine of collateral estoppel, a new trial on the issue of Churchills' fraud will include consideration of the notice to the Bank of Stapleton notwithstanding Gottsch's judgment against the Bank of Stapleton. We are mindful of the fact that a retrial under the directions specified may result in an incongruous situation: liability of the Bank of Stapleton, as FNB's agent, which has not appealed the judgment, and the possibility that FNB, as the principal which has appealed and won a new trial, may not be

liable on retrial if the evidence fails to establish that Churchills perpetrated a fraud on Gottsch or that the Bank of Stapleton had notice about Churchills' fraud, if established. That possible incongruity only emphasizes the sweeping effect of judicial notice and ramifications from improper use of judicial notice in a rather complex case. Nevertheless, we reverse the district court's judgment and remand this matter for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WHITE, J., concurs.