IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF GYPSEY N.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GYPSEY N., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TRACY H., APPELLANT.

Filed December 12, 2017.    No. A-17-185.

Appeal from the County Court for Adams County: MICHAEL P. BURNS, Judge. Affirmed.

Michelle J. Oldham, of Sullivan Shoemaker, P.C., L.L.O., for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

Tracy H. appeals from the order of the county court for Adams County, sitting as a juvenile court, terminating her parental rights to her daughter, Gypsey N. For the following reasons, we affirm.

## BACKGROUND

*Procedural Background.*

David N. and Tracy are the biological parents of Gypsey, born in October 2011. At the time of the juvenile court proceedings, Tracy was living in Texas. Although our record does not show the exact date of relinquishment, it is clear David relinquished his parental rights to Gypsey sometime between July 19 and August 22, 2016. Because David is not part of this appeal, he will only be discussed as necessary.

- 1 -

Gypsey was removed from David's care and custody on October 17, 2014. The basis of the removal is not apparent from our record. Gypsey was placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and into foster care where she has remained.

After a hearing on November 20, 2014, at which Tracy was present, Gypsey was adjudged to be a child as described in Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013). According to the court's journal entry, Tracy "ple[d] no contest to a no fault allegation." Although the November 20 journal entry does not appear in our record, we take judicial notice of that order. See Neb. Evid. R. 201, Neb. Rev. Stat. § 27-201 (Reissue 2016) (a judge or court has authority to take judicial notice of adjudicative facts, whether requested or not, and judicial notice may be taken at any stage of the proceeding). As we recently stated in *Mumin v. Nebraska Dept. of Corr. Servs.*, 25 Neb. App. 89, 96, ___ N.W.2d ___, ___ (2017):

> "[A]s a subject for judicial notice, existence of court records and certain judicial action reflected in a court's record are, in accordance with Neb. Evid. R. 201(2)(b), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 835, 458 N.W.2d 443, 455 (1990). "Thus, a court may judicially notice existence of its records and the records of another court, but judicial notice of facts reflected in a court's records is subject to the doctrine of collateral estoppel or of res judicata." *Id.* at 836, 458 N.W.2d at 456. See, also, *State v. Dandridge,* 255 Neb. 364, 585 N.W.2d 433 (1998); *Dairyland Power Co-op v. State Bd. of Equal.,* 238 Neb. 696, 472 N.W.2d 363 (1991). Furthermore, care should be taken by the court to identify the fact it is noticing, and its justification for doing so.

On July 19, 2016, the State filed a "Supplemental Petition" seeking to terminate Tracy's parental rights to Gypsey pursuant to Neb. Rev. Stat. § 43-292(1), (2), (6), and (7) (Reissue 2016); the State also sought to terminate David's parental rights pursuant to § 43-292(6) and (7). The State alleged after Gypsey was adjudged to be a child as described in § 43-247(3)(a), "the Court imposed reasonable rehabilitation plans in its disposition herein and conducted the said plans thereafter." (No rehabilitation plans appear in our record.) The State further alleged, as relevant here, that: Tracy had abandoned Gypsey for 6 months or more immediately prior to the filing of the petition; Tracy substantially and continuously or repeatedly neglected and refused to give Gypsey necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; Gypsey had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in Gypsey's best interests.

*Termination Hearing.*

The hearing on the supplemental petition for termination of Tracy's parental rights to Gypsey was held on December 2, 2016. Tracy did not appear at the hearing, but was represented by counsel who was present at the hearing. Counsel requested a continuance "to give me more time to meet with my client," but the request was denied. Two exhibits (an affidavit of service of summons on Tracy and a "DNA Test Report" showing maternity testing for Tracy) were received into evidence. The State called three witnesses, and Tracy called none.

LeAnn Tech, a child and family services specialist with DHHS, was assigned to Gypsey's case in September 2015 and was the ongoing caseworker at the time of trial. Tech testified that Gypsey became a state ward on October 17, 2014 (when she was 3 years old), and had been in an out-of-home placement ever since that time. Tracy was residing in Texas when Gypsey became a state ward, and continued to reside in Texas at the time of trial. Tech met with Gypsey every month and regularly communicated with her foster parents. She also communicated with David prior to his relinquishment. When the case was assigned to her, Tech had one telephone call with Tracy. After that, Tech made attempts to "engage" Tracy in the case, but was informed by Tracy that all communication needed to go through her attorney. Tech said she continued to make efforts each month to engage Tracy, but those attempts were unsuccessful. Tracy did not reach out to Tech, other than to respond to some of Tech's text messages, and the last text message Tracy sent was in November 2016. However, according to Tech, Tracy did reach out to another caseworker (the one who removed Gypsey from David's home) in "January and August 2016."

Tech testified Gypsey did not have any special needs, but when she first became a state ward, there were behavioral concerns. For example, at the time of removal, Gypsey had severe tantrums that lasted for long periods of time, she would hold her finger up to her head and say bang, and she would flip people off. Gypsey originally attended therapy with Bev Patitz twice a month, and then began seeing Janice Sherman weekly in October 2015. To Tech's knowledge, when Patitz was the therapist, there was one attempt to have a therapeutic telephone call with Tracy in August 2015, but based on information obtained from Patitz, that call did not go well. On cross-examination, Tech stated she spoke to Patitz, and Patitz "even submitted a letter in regards to the phone calls stopping because of Gypsey's behaviors. And at that time, [Patitz] recommended [Tracy] send letters, cards or gifts." To Tech's knowledge, Tracy did not participate in any therapy with Patitz or Sherman.

Tech said Tracy has not seen Gypsey since she became a state ward. And Tracy had not had any contact with Gypsey outside of the therapeutic setting. To Tech's knowledge, Tracy never sent any letters or gifts to Gypsey, nor did Tracy provide any financial assistance for her. Tech believed it would be in Gypsey's best interests to terminate Tracy's parental rights.

On cross-examination, Tech acknowledged that in the "very beginning of the case" Tracy asked to visit Gypsey, but Tracy had not asked since Tech became the caseworker in September 2015. Tracy has, however, asked that Gypsey be returned to her within the 6 months prior to trial. An "ICPC" was requested regarding placement, but it was denied; Tech did not explain why it was denied. Tech acknowledged there were never any arrangements made for Gypsey to travel to Texas to visit Tracy.

Sherman, a licensed mental health practitioner, had seen Gypsey weekly since October 2015. Sherman was initially contacted to work with Gypsey on expressing emotion; Gypsey had been removed from the home, was in a state of transition, and needed to process and work through what was happening. She was having difficulty with boundaries, dysregulated behaviors, disassociation, displaying hypervigilance, a high need for control, and frequent lying. Sherman worked with Gypsey through cognitive behavior play therapy. She said there had been "some ups and downs" with Gypsey's behaviors, but most recently there had been a decrease in those behaviors.

Sherman said that as far as she knew, David had taken Gypsey from Tracy's home around the time Gypsey was 11 months old. (On cross-examination Sherman was asked if she was aware Tracy had reported Gypsey was kidnapped by David. Sherman said she did "recall that that was mentioned" by third parties.) Gypsey was then left with multiple caregivers she did not know, and that David did not know very well, and there was a lot of disruption in Gypsey's care. Sherman testified Gypsey has been diagnosed with "Disinhibited Social Engagement Disorder," which is basically a trauma attachment disorder caused by a disruption in caregiving and neglect. Typically, children with that diagnosis have difficulties with boundaries and do not seek out comfort from caregivers. "Structure, consistency, unconditional love, and safety and stability are very important to all kids, especially kids with that diagnosis." According to Sherman, Gypsey does not respond well to change. And a change in placement would create a disruption for any child, especially a child who is sensitive to change. If there was a change in Gypsey's placement, Sherman would expect an increase in aggressive behaviors, and they would need to start over as far as building trust in order for Gypsey to feel safe and able to securely attach.

Sherman never heard from Tracy and never had any contact with her. When asked on recross if DHHS contacted her about trying to attempt contact with Tracy, Sherman said,

> Yes, [Tech] and I did talk about that [in the summer of 2016]. I believe, from the best of my recollection, the question was whether the timing was right to introduce . . . [Tracy] back into contact with Gypsey. . . . [B]ut as I recall, Gypsey was very dysregulated at that time. And just due to her reaction to change, that didn't feel like a good time to begin that interaction.

When asked if she would recommend visits take place between Tracy and Gypsey at this time, Sherman responded, "From what I understand, the previous contact was with the previous therapist and that created a lot of dysregulation for Gypsey at that time. I feel that that would probably just -- how Gypsey reacts to change would again start her into a regressive behavior pattern." When asked if she would recommend therapeutic visits before any other visits took place, Sherman said, "Absolutely there would be steps that would need to be taken to ensure that Gypsey was supported emotionally through that transition."

Gypsey's foster mother testified Gypsey had been in her care since May 2015. At that time, Gypsey had some dental issues, age inappropriate body awareness, speech delays, and unexpected emotional reactions (e.g. not crying when she got hurt, "just very solemn"). There was a decrease in behaviors over time with therapy. Gypsey "requires a lot of structure," "[a]nd she really likes to know what's coming next." If Gypsey does not know what is coming next, "there's a bit of anxiety[.] . . . And she'll inquire again and again if you kind of give her I don't know or we'll see." Gypsey was adjusting to change "a lot better" than she once did, as long as things were explained to her.

The foster mother testified that since Gypsey has been in her home, she has not had any visits with Tracy, and there had been no contact outside of the therapeutic setting. Gypsey did receive one birthday card from Tracy in October 2015, which the foster mother believed was received through Tech, but there were no other cards or gifts sent by Tracy.

*Juvenile Court's Decision.*

In its supplemental order filed on January 18, 2017, the juvenile court terminated Tracy's parental rights to Gypsey pursuant to § 43-292(7), and found that termination was in the child's best interests. Tracy has timely appealed the juvenile court's order.

ASSIGNMENT OF ERROR

Tracy assigns the juvenile court erred in finding that termination of her parental rights was in Gypsey's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Tracy's parental rights to Gypsey, the juvenile court found Gypsey had been in an out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)). Although Tracy does not appeal the statutory grounds for termination, we briefly address it for the sake of completeness. Gypsey had been in an out-of-home placement continuously since October 17, 2014. At the time the supplemental petition to terminate parental rights was filed on July 19, 2016, she had been in an out-of-home placement for 21 months. At the time of the termination hearing on December 2, Gypsey had been in an out-of-home placement for more than 25 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Tracy's parental rights under § 43-292(7) were proven by sufficient evidence.

*Best Interests.*

Under § 43-292, once the State shows statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also

through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Tracy argues "there is no evidence that [she] is an unfit parent." Brief for appellant at 5. See *In re Interest of Nicole M.*, 287 Neb. at 705, 844 N.W.2d at 80 ("The fact that a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness.") Tracy claims "the record contains very little information about [her] at all." Brief for appellant at 5.

The record before us is lean, and we agree it does not include much information about Tracy. However, the record does demonstrate that the State made efforts to engage Tracy in this case, but those efforts were unsuccessful. Tracy was present at a hearing in November 2014, after which Gypsey was adjudged to be within § 43-247(3)(a). Despite knowing that her daughter was a state ward, Tracy apparently made little effort to become involved in this case. Tech testified she had one telephone call with Tracy and after that, she made continued attempts to "engage" Tracy in the case, but the attempts were unsuccessful. Tech did acknowledge that Tracy responded to text messages as recently as a few weeks before the termination hearing.

Tech testified that to her knowledge, Tracy did not participate in any therapy with Patitz or Sherman. However, Tech said that when Patitz was the therapist, there was one attempt to have a therapeutic telephone call with Tracy in August 2015, but based on information obtained from Patitz, that telephone call did not go well, and the telephone calls were stopped because of Gypsey's behaviors. We acknowledge Tech's testimony is based on what was reported to her by Patitz, who did not testify at trial. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005) (termination of parental rights reversed; State used a DHHS worker as a proxy for all of the other witnesses whose expertise and testimony would have been helpful, and perhaps essential, in determining what was in the child's best interests.) (We recognize that *Aaron D.* is somewhat distinguishable in that Tech was not the only witness testifying for the State in the present case.)

After therapeutic telephone calls were stopped after the one call in August 2015, Patitz apparently recommended that Tracy send cards, letters, or gifts to Gypsey. Yet, the foster mother testified that Gypsey only received one birthday card from Tracy that October. No other cards, letters, or gifts were sent by Tracy.

Although the juvenile court found Tracy had "requested and pursued that visits take place," that finding is not supported by our record. Tech acknowledged that in the "very beginning of the case" Tracy asked to visit Gypsey, but said Tracy had not asked since Tech became the caseworker in September 2015. When asked if she would recommend therapeutic visits before any other visits took place, Sherman said, "Absolutely there would be steps that would need to be taken to ensure that Gypsey was supported emotionally through that transition." According to the foster mother, Gypsey has not had any visits with Tracy, and there had been no contact outside of the therapeutic setting.

Sherman and the foster mother both testified that when they met Gypsey in 2015, she had behavioral issues. Both agreed that Gypsey's behaviors had decreased over time. However,

Sherman testified that because of her diagnosis ("Disinhibited Social Engagement Disorder"), Gypsey does not respond well to change. The foster mother agreed that Gypsey had difficulty with change, and displayed anxiety if she did not know what to expect. If there was a change in Gypsey's placement, Sherman would expect an increase in aggressive behaviors, and they would need to start over as far as building trust in order for Gypsey to feel safe and able to securely attach.

Tech was the only witness to testify that terminating Tracy's parental rights was in Gypsey's best interests. Tracy argues appellate cases have "held that testimony regarding best interests that comes solely from the caseworker is insufficient. ([S]ee In re Interest of Aaron D., 269 Neb. 249, 691 N.W.2d 164 (2005), In re Interest of Skye W., 14 Neb. App. 74, 704 N.W.2d 1 (2005).)" Brief for appellant at 8 (underscoring in original). However, those cases are distinguishable. In both cited cases, the caseworker was the only witness called by the State, and the caseworker's testimony in each case was used "as a proxy for all of the other witnesses whose expertise and testimony would have been helpful, and perhaps essential, in determining what was in [the juvenile's] best interests." *In re Interest of Aaron D.*, 269 Neb. at 261-62, 691 N.W.2d at 174; *In re Interest of Skye W. & McKenzie W.*, 14 Neb. App. 74, 78, 704 N.W.2d 1, 4 (2005). And the caseworker in each of those cases testified based in large measure on records and reports generated by the family support workers, therapists, foster parents, and others who directly observed the parties. In the instant case, Tech was able to testify about her own unsuccessful attempts to contact Tracy to "engage" her in the case.

If Tracy disagreed regarding the State's efforts to engage her in the case, she should have presented evidence to the contrary. However, Tracy did not present evidence, nor did she appear at the termination hearing. There is no evidence that she was unaware of the hearing. She was previously personally served a summons to appear on the supplemental petition at a hearing on August 22, 2016, and the summons stated, "WARNING: Your failure to appear may result in a temporary or permanent loss of rights to the child(ren)." However the August 22 journal entry states Tracy did not appear at that hearing. The hearing was continued and eventually heard on December 2. Tracy did not appear on December 2. Tracy's counsel was present but did not argue that Tracy was unaware of the hearing or otherwise explain her absence. Counsel simply requested a continuance "to give me more time to meet with my client," but the request was denied. Given the significance of the termination hearing, we find Tracy's absence to be of import.

A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one. *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). The grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Kalie W.,* 258 Neb. 46, 601 N.W.2d 753 (1999). After our de novo review of the record, we find the State presented clear and convincing evidence that terminating Tracy's parental rights was in Gypsey's best interests.

"A court may not properly deprive a parent of the custody of his or her minor child unless the State affirmatively establishes that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right." *In re Interest of Chance J.*, 279 Neb. 81, 92-93, 776 N.W.2d 519, 528 (2009) (finding father forfeited his parental rights relating to child and that termination of father's parental rights was in child's best interests; father's only pre-petition contact with child was immediately following child's birth; father's willful failure to contact his

child, let alone parent him, caused the child to be placed in foster care for more than 3½ years.) Tracy has not seen Gypsey at least since the time she became a state ward in October 2014. And since May 2015, Tracy has only had one telephone call with Gypsey and sent her one card. Tracy has not asked for visits since September of that year. Tracy made little effort to become involved in this case. The evidence established that Tracy was unable or unwilling to perform reasonable parental obligations or be involved in Gypsey's life. Therefore, we find the evidence does establish that Tracy has forfeited her parental rights relating to Gypsey and that termination of her parental rights is in Gypsey's best interests.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Tracy's parental rights to Gypsey.

AFFIRMED.